**Timothy TAYLOR, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2006–SC–000863–MR.

Supreme Court of Kentucky.

Dec. 18, 2008.

As Modified on Denial of Rehearing March 19, 2009.

As Modified March 23, 2009.

Daniel T. Goyette, Louisville Metro Public Defender, Bruce P. Hackett, Deputy Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General, Paul W. Richwalsky, Jr., Assistant Jefferson County Attorney, Jefferson County Attorney's Office, Louisville, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Timothy Taylor appeals as a matter of right from an October 13, 2006 Judgment of the Jefferson County Circuit Court convicting him of intentional murder. The Commonwealth alleged that on December 29, 2003, Taylor, who was seventeen at the time, shot and killed Christopher Buckner outside a house on Whitman Way in Louisville, Kentucky. Several hours after the shooting, the police located Taylor at a house near the murder scene, arrested him, and took him to police headquarters, where Taylor confessed to shooting Buckner. Following Taylor's trial, the jury returned a guilty verdict and recommended that Taylor serve thirty years in prison. The trial judge subsequently reduced this recommendation and sentenced Taylor to twenty-five years imprisonment.

On appeal, Taylor argues that the trial court erred by (1) failing to suppress his confession, which, Taylor contends, constitutes error because the police illegally arrested him without a warrant, violated certain provisions of the juvenile code during his custodial interrogation, and failed to secure a knowing, intelligent and voluntary waiver of his *Miranda* rights; (2) allowing the Commonwealth to cross-examine Taylor about his failure to disclose his exculpatory statement to the trial judge or the investigating detectives prior to his trial; and (3) excluding certain impeachment evidence and evidence of the victim's prior arrest warrants, which prevented Taylor from being able to present a complete defense. Having concluded that Taylor's arguments are without merit, we affirm his conviction.

**RELEVANT FACTS**

At approximately 12:30 p.m. on December 29, 2003, Christopher Buckner was shot and killed outside of a house located at 3134 Whitman Way in Louisville. Witnesses at the scene told the police that two brothers, "Little Ray" and "Little Timmy," were involved in the shooting and that a blue Ford Crown Victoria had been seen driving away from the area. The police soon identified the two individuals as the defendant, Timothy Taylor [hereinafter Taylor], and his older brother, Raymond Taylor [hereinafter Raymond]. Shortly after the murder, the police found the blue Crown Victoria parked a few blocks away from the scene of the crime. Upon locating the vehicle, the police then saw Raymond walking toward the car. As the police began to approach the vehicle, Raymond ran and led them on a brief chase through the surrounding area. When Raymond was apprehended at 2:13 p.m., he informed the officers, "I can take you to the killer." The police then transported Raymond to the police station and continued to look for Taylor.

Shortly thereafter, the police received information from a different source that Taylor was staying at a house a few blocks away from the location of Raymond's arrest. The officers went to the address, obtained permission from its owner, Ms. Cathey, to enter the residence, and found Taylor standing in the hallway. The police then handcuffed Taylor and took him to the police station. After speaking with Louisville Police Detectives Lawson and Schraut, Taylor waived his *Miranda* rights and agreed to provide a formal statement to the police. In his taped confession, Taylor revealed that on the morning of the shooting, he discovered that his car had been broken into and that several items had been stolen, including his handgun. Suspecting Buckner of the robbery, Taylor and Raymond sought out Buckner and located him at the house on Whitman Way. Although Buckner was asleep when Raymond and Taylor got to the house, Buck-

ner was awakened and eventually went outside to talk with Raymond and Taylor. Taylor told the police that once Buckner was outside, he shot Buckner about two or three times with a 9mm. Taylor stated that he then ran to his car and drove away, while Raymond fled on foot.

Taylor and Raymond were jointly charged with Buckner's murder. The Commonwealth, however, severed the cases and chose to try Taylor first. On August 21, 2006, the jury found Taylor guilty of murder. The jury then recommended that he be sentenced to serve thirty years in prison. On October 13, 2006, the trial court reduced the jury's recommendation and sentenced Taylor to a total of twenty-five years imprisonment. Following his brother's conviction, on May 3, 2007, Raymond pled guilty to murder and received a twenty-year sentence. This appeal followed.

## ANALYSIS

### I. The Trial Court Did Not Err When It Admitted Taylor's Taped Confession.

During Taylor's trial, the Commonwealth introduced the audio-tape of Taylor's police interview, during which he confessed to shooting Buckner with a 9mm. Prior to trial, Taylor made a motion to suppress this recorded confession, alleging that his statements were the fruit of a poisonous tree because (1) his warrantless arrest was not supported by probable cause; (2) the police violated KRS 610.200(1) and KRS 610.220(2) during his detention; and (3) he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights. Following a suppression hearing, the trial court found on December 28, 2004, that the detectives had probable cause to arrest Taylor without a warrant, that Taylor confessed to the murder voluntarily with no police coercion, and that

based on the totality of the circumstances, Taylor waived his constitutional rights knowingly, intelligently, and voluntarily. Taylor now contends that the trial court erred with respect to each of its findings and that its failure to suppress his confession constitutes reversible error. Agreeing with the trial court's findings, we conclude that Taylor's confession was properly admitted at trial, and thus affirm.

### A. Because the Police Had Probable Cause to Believe that Taylor Had Committed a Felony, The Warrantless Arrest of Taylor Was Appropriate and Did Not Render His Confession Inadmissible.

■ After arriving at the murder scene, the detectives learned from eyewitnesses that two brothers, "Little Raymond" and "Little Timmy," were involved in the shooting. Eventually, witnesses identified these men as Timothy Taylor and Raymond Taylor. The detectives also learned that the men drove a blue Crown Victoria to and from the murder scene and, shortly thereafter, the officers found a blue Crown Victoria within three blocks of the shooting. One of the eyewitnesses confirmed that it was the blue car present during the murder. As the detectives identified the car, an individual matching the description of one of the brothers approached the vehicle. When the detectives tried to confront the individual, he fled the scene, leading the officers on a chase through the surrounding neighborhood. The officers eventually apprehended the suspect, who was determined to be Raymond Taylor, arrested him, and transported him to the police station. After Raymond's arrest, the police received information that Taylor was staying at a friend's house located approximately three blocks away from the murder scene. Upon arriving at that residence and gaining consent to enter from

its owner, the police found Taylor and arrested him.

■ Taylor argues on appeal that the statements he made to the police should have been suppressed as the product of an illegal, warrantless arrest. We disagree. According to KRS 431.005(1)(c), a police officer may effectuate an arrest without a warrant if the officer has probable cause to believe that the person has committed a felony. Probable cause has been defined as a "reasonable ground for belief of guilt" and requires the belief of guilt to be "particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), *quoting Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In Taylor's case, it is unquestionable that the arresting officer, after questioning the eyewitnesses, had probable cause to believe that a felony had been committed. The remaining issue is whether the officer had probable cause to believe that Taylor committed that felony. An appellate court reviews this question of probable cause pursuant to the *de novo* standard of review. *Commonwealth v. Priddy*, 184 S.W.3d 501, 504 (Ky.2005).

Although probable cause requires more than a mere suspicion, in Taylor's case, the information provided by the witnesses and confirmed by the officer's investigation established the probable cause needed to justify Taylor's warrantless arrest. The officers gained reliable information that Taylor and Raymond were involved in the shooting, found Raymond and the previously mentioned blue vehicle within three blocks of the murder scene, and apprehended Raymond after he ran from the police. These events strengthened the witnesses' reports that Taylor was also involved in the shooting and gave the officers reasonable grounds to believe that Taylor was guilty of committing a felony.

Therefore, the police had probable cause justifying the warrantless arrest of Taylor and his confession was not inadmissible on this basis.

**B. Because Taylor's Statements To The Police Were Given Voluntarily, The Alleged Violations of KRS 610.200(1) and KRS 610.220(2) Do Not Render Taylor's Confession Inadmissible.**

■ Upon taking or receiving a minor into custody, an officer must "notify the parent, . . . that the child has been taken into custody, give an account of specific charges against the child, . . . and the reasons for taking the child into custody." KRS 610.200(1). In Taylor's case, after the police interviewed the witnesses to the murder, they visited Raymond and Taylor's mother, Ms. Taylor, at her nearby residence and told her that her sons had been identified as being involved in the shooting. Out of concern that someone would seek retribution against Ms. Taylor, the police then took Ms. Taylor to the Fourth District Police Station for her safety. At the station, Detective Huffman met with Ms. Taylor and informed her that Raymond had already been arrested but that the police were still looking for Taylor. Ms. Taylor then gave her consent for the officers to search her home and vehicle. Several hours later, after Ms. Taylor had returned home and Taylor had been apprehended and questioned by the police, Detective Huffman called Ms. Taylor and informed her that both Raymond and Taylor had been arrested and charged with the murder of Buckner.

■ Taylor alleges on appeal that because the police did not formally notify Ms. Taylor of his arrest and charges until several hours after he had been taken into custody, his statements should have been suppressed as the fruit of a poisonous tree. However, even though Detective Huffman

failed to immediately notify Ms. Taylor of her son's arrest and charges in violation of KRS 610.200(1), the fact remains that the police had made efforts to contact her and keep her apprised of the situation: prior to Taylor's arrest, Ms. Taylor already knew that Taylor was a suspect in the murder, that Raymond had been arrested and taken into custody, and that the police were in pursuit of Taylor. Furthermore, this Court has held that a technical violation of KRS 610.200(1) does not automatically render a minor's confession inadmissible where it is otherwise shown to have been given voluntarily. *Murphy v. Commonwealth*, 50 S.W.3d 173, 184–185 (Ky.2001). Although such an infringement is an important factor in the overall analysis, if the confession was otherwise made voluntarily and was not the result of police coercion, it can still be admissible even though the police did not adhere to the statutory provisions of the juvenile code. *Id.* at 187 (Keller, J., concurring).

In Taylor's case, there is no evidence of police coercion or of Taylor's unwillingness to cooperate fully with the detectives. After the detectives advised Taylor of his *Miranda* rights, Taylor indicated that he did not have any questions, that he understood his rights, and that he wanted to talk about what happened. Taylor's subsequent statements and demeanor revealed that he was calm, aware of the consequences of his actions, and interested in helping himself by cooperating. The detectives gave Taylor a meal, drinks, cigarettes, and bathroom breaks. Rather than threatening or coercing Taylor, the detectives informed him that they could not guarantee any specific outcome in exchange for his cooperation. Because the record indicates that Taylor's statements to the police were given voluntarily, the alleged violation of KRS 610.200(1) does not constitute grounds for excluding Taylor's confession.

KRS 610.220(2) states that "[a] child may be held in custody ... for a period of time not to exceed two (2) hours, unless an extension of time is granted ... by the court, trial commissioner, or court-designated worker...." Taylor, who was seventeen at the time of the murder, was arrested and taken into custody at 3:41 p.m. A document made part of the record in this case indicates that Detective Schraut telephoned the Jefferson County Youth Detention Center at 4:35 p.m., but the court-designated worker was not available. Detective Schraut then tried to have the court-designated worker paged at 5:33 p.m. Fifteen minutes later, at 5:45 p.m., Detective Schraut spoke with the court-designated worker and received approval for a two-hour extension in order to continue questioning Taylor. At 7:22 p.m., the court-designated worker approved a second two-hour extension. At approximately 9:45, the police removed Taylor from the homicide office and transported him to the Jefferson County Youth Center.

Although Detective Schraut's report outlining his contact with the court-designated worker is part of the trial court's record in this case, Taylor maintains that the particular document was not specifically relied on by the Commonwealth and or the trial court in denying Taylor's suppression motion. We agree with Taylor that for whatever reason, the Commonwealth did not bring this document to the trial court's attention and did not argue that Detective Schraut had received two separate two-hour extensions during Taylor's interrogation. However, the fact remains that the police did comply with KRS 610.220(2) in acquiring the necessary extensions to hold Taylor in custody beyond the two-hour limit.

Furthermore, even without considering this document, the trial court properly

found that Taylor otherwise answered the detectives' questions voluntarily and was not coerced into confessing. As with a violation of KRS 610.200, this Court has specifically held that a minor's confession will not automatically be deemed inadmissible because the police did not strictly comply with the two-hour detention limitation set forth in KRS 610.220(2). *Shepherd v. Commonwealth,* 251 S.W.3d 309, 320 (Ky.2008) (holding that "trial courts should treat a violation of KRS 610.220 as an important factor in the overall determination of whether a juvenile defendant gave his statement voluntarily"). As explained above, Taylor was advised of and found to have properly understood his *Miranda* rights, was not coerced or threatened by the police, and cooperated freely in providing a statement. Thus, Taylor's confession was given voluntarily and any alleged violation of KRS 610.220(2) does not constitute grounds for suppressing his taped statements.

**C. Because Taylor Made a Knowing, Intelligent, and Voluntary Waiver of His *Miranda* Rights, The Trial Court Did Not Err In Denying The Motion To Suppress His Confession.**

■ After apprehending Taylor at his friend's house and learning that he was a minor, Detective Wescott immediately advised him of his *Miranda* rights. Approximately an hour later, at 4:47 p.m., the detectives transported Taylor to the police station and Detective Huffman advised Taylor of his *Miranda* rights for a second time. Taylor responded that he did not have any questions about his rights, did not want to invoke his rights, and wished to cooperate with the police by providing a statement. At 4:51 p.m., Taylor signed the "Rights Waiver" form and proceeded to detail the events of the shooting. Lastly, before the detectives began recording Taylor's formal statement, they read the *Mi-*

*randa* rights to Taylor for a third time. Again, Taylor had no questions about his rights, did not request to speak with a lawyer, and continued to provide his account of the murder to the police.

In *Miranda v. Arizona,* 384 U.S. 436, 467–469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that a person subjected to custodial interrogation must first be informed of his right to remain silent, his right to an attorney, and of the fact that anything he says may be used against him in court. These rights can be waived, however, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444, 86 S.Ct. 1602. For a waiver to be valid, the Commonwealth must show by a preponderance of the evidence that the defendant made an "uncoerced choice" to abandon his constitutional rights and that he was fully aware of both the nature of the right being waived and the consequences of waiving it. *Mills v. Commonwealth,* 996 S.W.2d 473, 482 (Ky.1999) (internal quotations omitted).

There is no evidence in this case that the police coerced Taylor into waiving his rights. Rather, the record indicates that after each instance of being informed of his rights, Taylor freely chose to waive them and cooperate with the police. Furthermore, despite Taylor's contention that his low intelligence and classification as a special education student prevented him from being able to understand the consequences of waiving his rights, his demeanor and interactions with the police demonstrated that he was fully aware of the situation. During his police interview, Taylor asked the detectives what his cooperation would do for him, inquired about the different degrees of manslaughter and accompanying prison sentences for each, and expressed a desire to tell the truth because it was the right thing to do. He

remained calm throughout the interview process and at no time appeared confused or anxious about having waived his rights. Thus, the trial court did not err in finding that Taylor waived his *Miranda* rights knowingly, voluntarily, and intelligently.

## II. The Commonwealth's cross-examination of Taylor Did Not Violate Taylor's Right to Remain Silent.

■ Taylor testified on his own behalf during his trial. On direct-examination, Taylor revealed that his statement to the police made immediately after the shooting was false and that his brother, Raymond, had actually murdered Buckner. On cross-examination, the prosecutor inquired of Taylor if this was the first time he had denied committing the murder and had blamed his brother instead. Taylor's counsel objected on the grounds that the question violated Taylor's right to remain silent, but the trial court agreed with the Commonwealth that this line of questioning was proper. The following exchange then took place between the prosecutor and Taylor:

Prosecutor: So I guess I want to know, Tim, if prior to saying, just that to the jury on Friday, I mean, we've been in court a lot haven't we, in the past couple of years, correct?

Taylor: Yes, sir.

Prosecutor: Judge Montano's been sitting there all along. Did you ever ask to approach the bench and tell her, "Hey you've got the wrong guy on trial"?

Taylor: No, sir.

Prosecutor: Did you ever reach out to Detective Huffman or Detective Lawson and say, "You know, I told you a bunch of stuff in the three hours, but it's not really true, but I made it all up, it's Raymond the guy you really want"? You didn't do that either, did you?

Taylor: No, sir. I never tried to talk to them.

Prosecutor: You just waited until Friday for the first time to say, "I made it up"?

Taylor: No, sir.

Prosecutor: Oh, there was another time?

Taylor: Yeah, when I talked to my family.

Prosecutor: But other than that?

Taylor: I never asked nobody nothing.

Taylor argues on appeal that the trial court violated his right to remain silent by allowing the Commonwealth to cross-examine him regarding his failure to disclose his exculpatory statements to the trial judge and the detectives during the years leading up to his trial.[1] We disagree and find that these questions did not infringe on the defendant's right to remain silent.

■ The United States Supreme Court held in *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that the Due Process Clause of the Fourteenth Amendment is violated when a prosecutor impeaches the defendant's trial testimony by referring to the fact that he remained silent after being arrested and being advised of his *Miranda* rights. In *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), however, the Court explained that the prohibition in *Doyle* "does not apply to cross-examination that merely inquires into prior inconsistent statements." Thus, if after receiving the *Miranda* warnings the defendant does not invoke his right to remain silent and in-

---

1. Although Taylor did not specifically object to the Commonwealth's question regarding whether he had told the judge or the detectives about his innocence, he did object to the Commonwealth's general questioning of his failure to disclose his exculpatory statement prior to trial, thus preserving this argument for appeal.

stead provides a statement to the police, it is permissible to cross-examine the defendant on how and why his prior statement is inconsistent with his trial testimony. *Id.* at 408–409, 100 S.Ct. 2180. The *Anderson* Court reasoned that this type of cross-examination "makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* at 408, 100 S.Ct. 2180.

Here, because Taylor voluntarily provided a statement to the police and did not remain silent after receiving his *Miranda* rights, it was permissible for the prosecutor to cross-examine Taylor about the discrepancies between his prior confession and his trial testimony. This includes asking Taylor why, if his prior statement to the police was false and his current trial testimony is true, he did not reveal it to anyone prior to trial. Furthermore, asking Taylor if he had disclosed his innocence to the trial judge or the detectives also did not infringe on Taylor's constitutional right to remain silent because, as noted above, he waived this right.

Although both of these questions were proper under *Anderson, supra,* the latter question regarding why Taylor did not talk to the trial judge or the detectives has been challenged as improperly suggesting that defendants have a duty to come forward and disclose their exculpatory statement to state actors. Clearly no such duty exists and counsel should avoid any questions implying as such. However, cross-examination questions which simply reflect that a defendant has had the opportunity pretrial to inform the judge or detectives of his recantation and has not done so are not improper. We believe the questions at issue fall in the latter category. Thus, the trial court did not err in permitting the Commonwealth to cross-examine Taylor about his prior inconsistent statement.

## III. The Trial Court Did Not Deny Taylor a Fair Opportunity to Present His Defense.

Taylor's sole theory of defense at trial was that the detectives deceived him into confessing to the murder charge with promises that he would be taken care of and would not receive a harsh punishment. Taylor testified that had he known he would be facing twenty-five years in prison, he never would have taken the blame for his brother, who he contends was the actual shooter. During his trial, Taylor sought to introduce evidence supporting this theory. First, Taylor tried to introduce a portion of his brother Raymond's police interview, where Louisville Police Detective Finch told Raymond that he, as a real man, would have done the same thing Raymond had done when he confronted Buckner. Taylor argued that this portion of Raymond's interview was relevant in his trial to impeach a different detective, Louisville Police Detective Huffman. Huffman was also present during Raymond's interview, and he testified during Taylor's trial that the police did not discuss tactics before interrogating suspects and that it was uncommon for police to use deception in their interviews. The trial court ruled that evidence of what occurred during Raymond's police interview was not relevant in Taylor's trial, but permitted Taylor to introduce it by avowal.

Second, Taylor attempted to testify that the police detectives told him they did not care about Buckner's death and he tried to introduce evidence of Buckner's three outstanding criminal indictments. Although the trial court ruled that the detectives' statements during Taylor's interrogation were inadmissible hearsay, it permitted Taylor to testify regarding what he was led to believe about the consequences of taking the blame for the mur-

der. The trial court also excluded any mention of Buckner's prior criminal history as being irrelevant and prejudicial. A trial court's decision regarding the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). Such an abuse will be found if the trial court's decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* Finding that the trial court did not abuse its discretion in refusing to admit this evidence, we affirm.

Taylor's first argument regarding the admissibility of Detective Finch's statement is without merit. During Raymond's police interview, Detective Finch told Raymond that as a man, he would have done the same thing Raymond did. Taylor contends that because Detective Huffman was in the interview room when Detective Finch made this statement, and because Detective Huffman testified in Taylor's trial that coercive tactics were uncommon, Detective Finch's statement is admissible to impeach Detective Huffman's testimony and to show that Taylor was indeed coerced into confessing. The only authority Taylor cites to support his argument is *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), which upholds a defendant's right to develop the record fully when cross-examining a witness about a potential bias. Taylor argues that impeaching Detective Huffman with Detective Finch's statement would have enabled him to develop a record not only as to whether he was coerced into confessing, but also as to why he made a false confession. However, permitting impeachment evidence to be introduced in order to bolster the defendant's claim of coercion is far removed from the facts of *Davis, supra,* where the defendant was given latitude in his cross-examination of an allegedly biased witness.

Furthermore, as the Commonwealth points out, Detective Huffman was not even one of the interrogating officers involved in taking Taylor's statement. Rather, Detective Huffman spoke with Taylor briefly after he arrived at the police station in order to advise him of his *Miranda* rights. In addition, Taylor is not trying to impeach Detective Huffman's testimony with anything that occurred during his own police interview, but rather, with what was said during his brother's police interrogation. Despite Taylor's claim of relevancy, we find that what occurred during his brother's interrogation is irrelevant to Taylor's claim of coercion. Therefore, what Detective Finch told Taylor's brother during his police interview was irrelevant to Detective Huffman's testimony and the trial court did not abuse its discretion in excluding it.

■ Taylor also argues that he should have been able to introduce evidence of the fact that Buckner had several active bench warrants for his arrest at the time of his death. Prior to trial, Taylor argued that Buckner's prior indictments could be relevant to a claim of self-defense or could be "inextricably intertwined" with other relevant evidence. Because the trial court did not make a ruling on this evidence prior to trial, the parties revisited the issue on the morning of trial. At this time, defense counsel argued that Taylor's awareness of Buckner's criminal history, which involved numerous drug offenses as well as robbery, burglary, and assault charges, explained why Taylor was willing to take the blame for the shooting. The trial court disagreed, found this evidence to be irrelevant and prejudicial, and excluded it from trial.

On appeal, Taylor argues that Buckner's outstanding criminal warrants should have been admitted because they corroborated

his testimony regarding why the police tricked him into taking the blame for Buckner's murder and why he gave a false confession. Taylor testified during his trial that he was encouraged by the police to take the blame for the murder charge, was led to believe by the police that he would be a hero if he confessed, and believed he would be placed on a bond and released on home incarceration. Taylor now contends that evidence of Buckner's active bench warrants would have made the jury more likely to believe that the police were looking for Buckner, really did not care about Buckner's death, and had convinced Taylor that nothing would happen to whomever confessed to the murder.

■ The Commonwealth is correct that KRE 404(a) generally prevents evidence of a person's character to be admitted "for the purpose of proving action in conformity therewith on a particular occasion." Kentucky Rules of Evidence 404(a). In addition, absent a self-defense claim, evidence of a victim's bad character or prior bad acts is generally irrelevant to the defendant's guilt or innocence. *Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky.1998). However, in this case, Taylor wanted to introduce evidence of Buckner's outstanding bench warrants not to prove that Buckner acted in conformity with his criminal history, but rather, to strengthen Taylor's explanation for why he falsely confessed: the detectives had led him to believe that because Buckner was wanted by law enforcement, whoever took the blame for his death would not be punished harshly and would be taken care of by the police. Nonetheless, even if this evidence was relevant to Taylor's defense theory, the trial court found in accordance with KRE 403 that its probative value was outweighed by its prejudicial effect. As the Commonwealth demonstrated, admitting evidence of Buckner's outstanding bench

warrants certainly portrayed the murder victim in a negative light and could have unduly prejudiced the prosecution's case. Although the admissibility of this evidence is a close call, we find that the trial judge's decision to exclude it was not unreasonable or arbitrary. Thus, the trial court did not abuse its discretion in this instance.

■ Regardless, even if the trial court did err by excluding the evidence of Buckner's outstanding bench warrants, such error would have been harmless. First, despite the excluded evidence of Buckner's criminal record, Taylor was still able to present his defense theory during his own trial testimony. Taylor expressly testified that the police deceptively led him to believe that he would be taken care of if he confessed, that he would be considered a hero, and that he would only be put on home incarceration. Furthermore, as noted above, there was substantial evidence of Taylor's guilt presented at trial: Taylor confessed to the murder hours after it happened; eyewitnesses placed him at the scene of the crime; and other than Taylor's self-serving claims of police deception, there was no evidence of police coercion or of Taylor's unwillingness to cooperate with the investigating detectives in providing a statement. Thus, Taylor is not entitled to a new trial on this basis.

## CONCLUSION

Because the police had probable cause to arrest Taylor without a warrant, because Taylor confessed voluntarily and without police coercion, and because Taylor waived his *Miranda* rights knowingly, intelligently, and voluntarily, the trial court properly admitted Taylor's taped police confession at trial. Furthermore, the trial court did not err in permitting the Commonwealth to cross-examine Taylor about his prior inconsistent statement made during his police interview. Lastly, the trial court did

not abuse its discretion in excluding certain evidence offered by Taylor to support his defense theory. Therefore, Taylor's October 13, 2006 Judgment of the Jefferson County Circuit Court convicting him of intentional murder is affirmed.

All sitting. All concur.