RENDERED:  FEBRUARY 24, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0391-DG

JOHNNY R. COX                                                                          APPELLANT

|                          | ON REVIEW FROM COURT OF APPEALS |
| :--- | :--- |
| V. | CASE NO. 2019-CA-0931 |
|                          | FAYETTE CIRCUIT COURT NO. 16-CR-00052 |

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

Johnny R. Cox (Cox) entered a conditional guilty plea to first-degree sexual abuse and second-degree persistent felony offender (PFO).  He reserved the right to appeal the trial court's denial of two motions to suppress an interview with police wherein he confessed.  The Court of Appeals affirmed the trial court's rulings, and Cox appealed.  This Court granted discretionary review to address two issues.  First, whether Cox knowingly, voluntarily, and intelligently waived his *Miranda*[1] rights prior to speaking with police.  And, whether Cox unambiguously and unequivocally invoked his right to counsel during the interview.

---

[1] *See Miranda v. Arizona,* 384 U.S. 436 (1966).

After review, we affirm the Court of Appeals' holding that Cox knowingly, voluntarily, and intelligently waived his *Miranda* rights, though on slightly different grounds. We reverse the Court of Appeals' holding that Cox did not invoke his right to counsel. Accordingly, we remand this case for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On November 23, 2015, Detective Joseph Oliver (Detective Oliver) responded to a call regarding an investigation into the sexual abuse of a child. When he arrived at the scene, two witnesses told him they saw Cox touch a nine-year-old girl on her vagina with his hand while giving her a hug. The victim, Cox's niece,[2] also told the detective that Cox touched her vagina. Detective Oliver then went to Cox's home and asked him to come to the police station to speak with him; Cox did so willingly. Before the interview, Detective Oliver Mirandized Cox. Cox waived his rights and eventually confessed that he "made a mistake" and "probably" touched the victim on her vagina. He was subsequently indicted on one count of first-degree sexual abuse, victim under twelve, and one count of first-degree PFO.

In August 2016, the defense filed a motion to suppress Cox's interview with Detective Oliver on the grounds that he did not knowingly, voluntarily,

---

[2] At various places in the record the victim is also referred to as Cox's grand-niece. We will refer to the victim as Cox's niece, as she is most consistently identified in that manner.

and intelligently waive his *Miranda* rights. Defense counsel asserted that Cox's low IQ and history of mental illness prevented him from understanding his *Miranda* rights and the consequences of abandoning them. In response, the Commonwealth requested that he be sent to Kentucky Correctional Psychiatric Center (KCPC) for an evaluation regarding his competency to stand trial and his criminal responsibility. The trial court ordered the same in September 2016.

Several months later, the trial court conducted a competency hearing. The sole witness was Dr. Jaclyn Williams (Dr. Williams), the psychologist who performed Cox's competency and criminal responsibility evaluations during his nearly two-week stay at KCPC. Based on her evaluations, Dr. Williams compiled a report wherein she opined that Cox was competent to stand trial and could be held criminally responsible for his actions.

In her report, Dr. Williams recounted Cox's lengthy history of hospitalizations. Cox had previously been admitted to KCPC five times between 1989 and 2014; Bluegrass Regional Mental Health Center (Bluegrass Regional) two times between 2006 and 2007; Eastern State Hospital (Eastern State) fourteen times between 1985 and 2007; and the University of Kentucky Hospital (UK Hospital) nineteen times between 2004 and 2013.

Cox's first admission to KCPC, from February to April 1989, was an inpatient admission; he was diagnosed with polysubstance abuse and borderline intellectual functioning. The KCPC evaluator determined him to be competent to stand trial. He was treated again at KCPC, this time on an

outpatient basis, on February 24, 1998.  During that stay, he was diagnosed with "Alcohol Dependence, Rule out for unspecified Cognitive Disorder, Rule out Unspecified Psychotic Disorder, and Personality Disorder with schizotypal and antisocial features."  The KCPC evaluator concluded that he was not competent to stand trial, and referred him to KCPC for inpatient treatment.  That inpatient treatment occurred from March to May 1998.  Cox was diagnosed with "Unspecified Schizoaffective Disorder, Chronic Substance Dependence (cocaine, alcohol, marijuana, and solvents), Adjustment Disorder with depression and anxiety, and Mild [intellectual disability]" and was opined competent to stand trial.

During his fourth KCPC admission, from March to May 1999, he was diagnosed with "a Combination of Drug Dependence Excluding Opioid Type Substances, Adjustment Disorder with Mixed Mood and Emotions" and mild intellectual disability.  His evaluator concluded that he was competent to stand trial and could be held criminally responsible for his actions.

His fifth KCPC admission occurred between January and February 2014. He was diagnosed with "Polysubstance Abuse in forced remission[,] Rule out Unspecified Depressive Disorder, Malingering, Rule out Dementia, Mild, secondary to long term alcohol abuse, and Unspecified Personality Disorder with Antisocial traits."   His records from this admission state that he "refused to put forth any effort on any of the tasks."  He received scores "significantly below chance" on the Test of Memory Malingering (TOMM), which "[suggested] that he knew many of the right answers but purposefully chose the wrong

4

ones." And, on the Miller Forensic Assessment of Symptoms (MFAST) his total score "was substantially above the cut off established for assessing exaggeration of psychiatric symptoms and complaints."

Cox's two admissions to Bluegrass Regional seemed to be more closely related to his long-standing substance use disorder. He was admitted in August 2006 to detox following an arrest and was diagnosed with alcohol dependence and psychotic disorder, not otherwise specified. Cox left after three days against the staff's advice. He was admitted again less than a year later in April 2007. His primary reason for admission was his desire to stop drinking. He self-reported some paranoia and hearing voices at night that were "commenting on his behavior." He was diagnosed with alcohol dependence and psychotic disorder and again left against the staff's advice after a week.

Cox's diagnoses during his numerous admissions to Eastern State included: alcohol dependence; antisocial personality disorder; history of seizure disorder; mild intellectual disability; adjustment disorder; unspecified personality disorder with antisocial traits; mood disorder, not otherwise specified; unspecified psychotic disorder; cocaine abuse; cannabis abuse; borderline traits; borderline intellectual functioning; and depression. During one stay in 1990 he was evaluated and found competent to stand trial.

Finally, several of Cox's admissions to UK Hospital led to seventy-two hour holds due to his level of intoxication. At various times he self-reported hearing voices telling him things like "get some help." His diagnoses included "Alcohol Abuse; Unspecified Mood Disorder; History of Schizophrenia and

5

Depression; Mild Intellectual Disability; Schizoaffective Disorder; Rule Out Malingering; Depression; Cocaine Abuse; and Rule Out Psychotic Disorder."

Pertaining to the competency evaluation ordered in this case, Dr. Williams testified that Cox's effort varied somewhat, but overall he did not put forth good effort during testing. On the TOMM, which is normed on individuals with conditions such as traumatic brain injuries and neurodegenerative disorders, Cox's scores were "grossly below chance levels of responding." According to Dr. Williams, even individuals with extreme memory disfunction can score 45/50 on the TOMM. Cox's scores were 10/50; 5/50; and 6/50, respectively. Dr. Williams concluded that Cox's scores were "incontrovertible evidence of feigning memory impairment and cognitive functioning." Similarly, on the MFAST, Dr. Williams testified that any score above 6 indicates that an individual is exaggerating or over-reporting psychiatric symptoms; Cox's score was 19. Cox put forth such poor effort on other measures, such as the Inventory of Legal Knowledge (ILK) test and the Kaufman Brief Intelligence Test (KBIT-2), that they could not be completed.

Because of his poor effort on the KBIT-2, Dr. Williams was unable to determine Cox's IQ. However, his school records revealed that his full-scale IQ was 61 when he was eight years old. Dr. Williams testified that a person's IQ score tends to remain stable throughout his or her life, and she would accordingly expect that Cox's IQ is still in the 60s range.

To assess Cox's competency to stand trial, Dr. Williams administered the Competency Assessment for Standing Trial for Individuals with Mental

6

Retardation (CAST-MR). The CAST-MR consists of three sections: the first two sections are multiple choice and the third section consists of open-ended questions about the details of the individual's own criminal case. Cox provided poor effort and scored significantly below chance on both of the multiple-choice sections of the assessment. However, on the open-ended questioning portion of the test, he scored 9/10. Cox evinced an understanding of the differing roles of the individuals involved in a trial. He knew that his attorney wanted him to be found not guilty; that the judge "decides what is going on, if you're guilty or not guilty,"[3] and that if "you're not guilty he has to cut you loose." He also knew that the prosecutor was trying to "get [him] ten years." Cox likewise understood the plea-bargaining process. When asked what would happen if he pled not guilty, he responded, "I can't stand a trial, but it would have to go to trial." He identified plea offers that he would be likely to accept as well as those that he would adamantly refuse, and he recognized the importance of speaking to his lawyer before accepting or rejecting a plea offer.

In addition, Cox showed a "clear understanding" of the facts surrounding his arrest while adamantly maintaining his innocence. He described his PFO charge as: "They pull up all this stuff that I've done before to give me the charge," and explained his sexual abuse charge as being accused of "touch[ing]

---

[3] On cross-examination, Dr. Williams acknowledged that she did not discuss the role of the jury with Cox. However, during the second competency exam ordered in this case, she did. Cox responded that the jury "decides if you are guilty or if you'll get out or not."

my [niece] in a bad way." He also identified the sexual abuse charge as a Class C felony, and knew that he could receive a sentence between five and ten years if convicted. Finally, Cox expressed anxiety about being sent to prison when he stated, "I cannot make it in the penitentiary because of what I'm charged with." This statement came after he claimed not to know what a "penitentiary" was during the multiple-choice portion of the CAST-MR.

Dr. Williams' report further discussed that during Cox's stay at KCPC, he had no issues attending to his personal hygiene or the cleanliness of his room. He "did not evidence any indicia of psychosis or thought disorder," and was only prescribed Celexa for anxiety upon discharge. Based on the foregoing, Dr. Williams diagnosed Cox with malingering cognitive symptoms; unspecified personality disorder with antisocial traits; alcohol use disorder; unspecified personality disorder; rule out pedophilia attracted to females; and rule out mild intellectual disability. In her opinion, Cox was competent to stand trial and could be held criminally responsible for his actions.

At that time, the defense did not dispute Cox's competency and therefore presented no evidence at the competency hearing. The trial court consequently found that Cox was competent to stand trial.

Following the court's competency ruling, the defense filed a revised motion to suppress. In it, the defense asserted that Cox's interview with Detective Oliver should be suppressed because Detective Oliver did not stop the interview after Cox invoked his right to counsel. Or, in the alternative, the statement should be suppressed because Cox did not provide a valid waiver of

8

his *Miranda* rights.  The defense's arguments for suppression were addressed in separate hearings.

The first suppression hearing concentrated on whether Cox invoked his right to counsel.  The sole witness was Detective Oliver.  He testified that he had encountered Cox several times during his time as a police officer; Cox was drunk "every time" he interacted with him, and he was often belligerent, out of control, and unable to hold a conversation.  But, when Detective Oliver encountered Cox on November 23, 2015, Cox was coherent and could carry on a conversation.  However, sober or not, Cox has a "country accent" that "doesn't come naturally to [Detective Oliver's] comprehension."  Detective Oliver said he therefore often had a difficult time understanding what Cox was saying.  Detective Oliver further testified that Cox was not drinking that day, though the record clearly refutes that: during the interview Cox told Detective Oliver that he had "some beer" a "couple of hours" before, and Detective Oliver's arrest citation stated that alcohol use was involved in the alleged crime.

Concerning Cox's claim that he invoked his right to counsel, Detective Oliver reviewed the recording of his interview with Cox prior to the suppression hearing.  When asked what he heard Cox say during the portion of the interview at issue, Detective Oliver responded, "It's very hard to understand.  He does mention something, something, something about a lawyer or an attorney.  I couldn't understand what was before and what was after it, so I continued on with the interview."  Detective Oliver claimed that he did not hear Cox say the word "lawyer" in real time, and that he did not understand Cox to

9

have asked for a lawyer. He maintained that he would have stopped the interview if Cox had asked for a lawyer. The portion of the interview in question was played three times at the trial court's request, and was then entered into evidence. The court ordered briefing and took the issue under advisement.

The court ultimately found that Cox did not invoke his right to counsel, and denied his motion to suppress. The court's order found:

> In the case at bar, [the] Court has reviewed the interview tape numerous times and has attempted to transcribe the interchange at issue:
>
> Det. Oliver: So, Joey thought that, that you tried touching—who is it?
>
> Defendant: [inaudible]
>
> Det. Oliver: Amber?[4]
>
> Defendant: Yeah. So when they try to accuse me of doing something [inaudible] talk to a [expletive] lawyer. I'm serious, man.
>
> [. . .]
>
> The Court finds that Det. Oliver acted reasonably in continuing with the interview even after the Defendant's statements about a lawyer as the Defendant's statements were not clear and unequivocal in light of the circumstances. [*Davis v. United States*, 512 U.S. 452, 459 (1994)]. Even though the Defendant may have said that he wanted to talk to a lawyer, the Court does not believe that it was unreasonable for Det. Oliver either to have misheard the Defendant's statements or to have placed them in a different context at that time.
>
> The Court notes that the Defendant's dialect and manner of speaking is indeed unusual. The Court, upon repeated listening

---

[4] It should be noted that this is not the victim's name.

and review of the interview tape, found the Defendant's speech difficult to understand, and believes that a reasonable person could view the comments at issue as something other than an affirmative request for an attorney. Further, the Defendant's statement about talking to a lawyer occurred immediately following a comment he appeared to make in reference to being accused by another person rather than by the police; as such, it could appear to a reasonable person that the Defendant's comment was not an invocation of his right to counsel.

About two months later, the trial court held the second suppression hearing. The hearing focused on whether Cox knowingly and intelligently waived his *Miranda* rights prior to speaking with Detective Oliver. The Commonwealth's only witness was Detective Oliver. He stated that, after getting some basic information from Cox, he Mirandized him. Detective Oliver said he had no reason to believe that Cox did not understand his rights; Cox was not disoriented or intoxicated and engaged in "by far" the most coherent and intelligent conversation Detective Oliver ever had with him. Detective Oliver was unaware of Cox's history of hospitalizations.

During Detective Oliver's testimony, the Commonwealth played the portion of the interview wherein Cox was Mirandized. It went as follows:

**Q:** Fantastic. That's good. Let me do this. I know you probably heard it read to you before, your *Miranda* rights. It's just something we do. All right? You've probably seen it on TV as well maybe.
**A:** Yeah.
**Q:** But I'm just going to go ahead and I'm going to read them to you, okay? And then we'll talk about it. So, I am a police officer and you have the right to remain silent. You do not have to make any statement or answer any questions. Any statement you do make or any question you do answer, may be repeated at any later hearing or trial—
**A:** Uh-huh (affirmative).
**Q:** —whether it be for you or against you or for or against any other person. If you decide to make a statement or answer any

11

questions, you need to know that if you change your mind you have the right to stop giving your statement or answer any questions at any time. You have the right to speak with a lawyer before making any statement or answer any question. You have the right to have a lawyer here with you during any questioning. If you cannot afford to hire a lawyer, the court can appoint one for you. Do you understand these rights as I have explained them to you?

**A:** What's going on now?

**Q:** Well, I'm just reading your rights like we do. Do you understand those rights?

**A:** What's going on now?

**Q:** What do you mean what's going on? You are not under arrest. You haven't been charged with anything. You're not—

**A:** (Gesturing towards a piece of paper on the table) Turn the page. Let me say something. Come on.

**Q:** Turn the page?

**A:** Yeah, turn the page. Come on, I used to be a lawyer, bro.

**Q:** That's a blank page. That's just a note page. That's if you tell me anything, anything good or you wanted to write anything down, that's what that's for. So, do you understand your rights?

**A:** Yeah.

**Q:** Yeah, you understand?

**A:** You got to understand, I ain't done nothing.

In addition, the Commonwealth asked the court to consider the evidence that was presented during the competency hearing as well as Cox's criminal history as evidence of a valid waiver. The Commonwealth submitted an exhibit of Cox's criminal record via CourtNet into evidence. The defense objected on relevancy grounds, but the trial court admitted it with an acknowledgement that it would only consider it as evidence of Cox's prior experience of interacting with, and being questioned by, the police.

Indeed, Cox's criminal record dated back to 1986 and included: 326 convictions for alcohol intoxication in a public place; forty-seven convictions for second-degree disorderly conduct; eleven convictions for theft by unlawful taking; ten convictions for violating an EPO/DVO; five convictions for fourth-

12

degree assault; four convictions for third-degree terroristic threatening; two convictions for third-degree criminal trespass; two convictions for third-degree burglary; and one conviction on each of the following: second-degree burglary, second-degree criminal mischief, third-degree criminal mischief, receiving stolen property, first-degree disorderly conduct, menacing, and giving a police officer a false name or address.

For its part, the defense offered testimony from Dr. Eric Drogin (Dr. Drogin), a clinical and forensic psychologist who examined Cox at the Fayette County Detention Center four times in 2016. Dr. Drogin testified that during their first meeting on May 9, Cox was "highly distractible" and "extraordinarily hard to keep on track conversationally." He administered the Cognitive Capacity Screening Examination, which is designed to screen for the presence of cognitive defects. Cox's score was 4/30, which Dr. Drogin believed "reflected significant problems with concentration, abstract reasoning, short-term memory, and orientation." In addition, Cox identified the then-current month as "April," and could not identify the year.

During his second meeting with Cox on May 25, Cox presented in a similar manner as the May 9 meeting. Dr. Drogin again administered the Cognitive Capacity Screening Examination. Cox's score of 6/30 was a mild improvement, but was still "notably substandard." Dr. Drogin only administered one test; he thought that was all Cox could tolerate because he was "just so scattered." However, he was able to interview Cox about things like his educational background and history of hospitalizations. Dr. Drogin's

report notes that Cox's school records indicated IQ scores of 61 and 67. On June 16, Dr. Drogin met with Cox a third time. This was his least productive interaction with Cox. Cox was particularly difficult to keep on track conversationally and kept redirecting questions to other topics; Dr. Drogin was unable to administer any tests.

During their final meeting on July 22, Dr. Drogin administered Rey's 15 Item Test, which is designed to determine if someone is faking a neurocognitive disorder. In Dr. Drogin's opinion, Cox's score of 12/15 "[alleviated] any concerns that [Cox] might be feigning some sort of cognitive disability." Dr. Drogin also questioned Cox about his *Miranda* rights on this occasion. Cox recalled that "they have to read you your rights," and, regarding what those rights were, he said, "you have an attorney . . . anything said would be recorded against you according to a lawyer." Dr. Drogin then unpacked each of those statements with him. Cox said that "you have an attorney" means that "the lawyer is trying to help me . . . and the lady[5] is trying to help me too" and "he's a Christian . . . trying to help . . . and the lady, she's concerned about me too." When asked what "anything said would be recorded against you" meant, Cox responded, "I don't know . . . went downtown . . . over and over." Finally, when Dr. Drogin asked him what "according to a lawyer" meant, he said, "he's trying to defend me; that's what going on . . . when you got a bad record, you try to find out what's going on."

---

[5] By "the lady" Cox seemed to be referring to the defense's investigator.

14

In general, Dr. Drogin described Cox's lack of participation in testing as an inability to do so rather than an intentional choice not to put forth any effort. He opined:

> In light of such factors as alcohol ingestion, aberrant behavior, contradictory input in the course of advisement of his rights, later inability to recall or process key factors of his rights, substantial documentation of intellectual and psychiatric impairment, and current confirmation of cognitive deficits supported by negative findings on a Malingering screening test, Mr. Cox cannot, to a reasonable degree of psychological certainty, be considered to have provided a knowing, voluntary, and intelligent waiver of his rights on the date in question.

After the proof in the suppression hearing concluded, the trial court ordered briefing and took the matter under advisement. Nearly three months later, the trial court entered an order denying Cox's motion to suppress. It ruled:

> [I]n viewing the totality of the circumstances surrounding the interview by Detective Oliver, the Defendant did knowingly and intelligently waive his *Miranda* rights. Various factors pull in opposite directions in making this determination. The testimony and findings of Dr. Drogin regarding the Defendant's mental and intellectual limitations may weigh in favor of a finding that the Defendant's waiver was not knowing and intelligent; however, the conclusions that Dr. Drogin reached are not binding upon the Court or dispositive of the issue, and the remaining factors that the Court has considered ultimately require the conclusion that the waiver was valid.
>
> The Court notes that while some of Dr. Drogin's conclusion that the Defendant could not have knowingly and intelligently waived his *Miranda* rights during the interview in question may have been based upon a review of the recording of the interview, much of Dr. Drogin's findings appear to have been based upon examinations and evaluations conducted in the months following the interview. While the results from those tests prove helpful in determining the Defendant's mental state and capacity at the time of the tests, they may not sufficiently reflect his mental state and capacity at the time of the interview.

15

Although the Defendant claims in this instance not to have understood his *Miranda* rights and what a waiver of those rights meant, after having his *Miranda* rights explained to him and being asked (multiple times) if he understood them, the Defendant indicated that he did. Det. Oliver did not state that he ever believed that the Defendant was unable to understand his *Miranda* rights.

[. . .]

Further, the Defendant has had an extensive criminal background and has been convicted of multiple felonies; his prior experience with law enforcement and interrogations lead to the inference that the Defendant was aware of his rights and the effect of waiving those rights when he chose to speak with Det. Oliver in this case. In fact, the Defendant's comments during the interview suggest that he understood why he was being questioned and the context of the situation at hand.

Two months after the court's ruling, the defense filed a motion for another competency hearing. The motion alleged that defense counsel had been unable to prepare for trial or engage in any meaningful discussions about a plea bargain with Cox because he had not given coherent responses to counsel's inquiries. The court ordered a second KCPC evaluation to determine Cox's competency. Dr. Williams conducted Cox's second evaluation, and again filed a report that concluded Cox was competent to stand trial.

After Dr. Williams' second report was submitted, defense counsel asked her to review a video of Cox interacting with them and consider it as part of her competency determination; she obliged. In her revised report, she acknowledged that in the video Cox "was quite difficult to interact with, as he frequently spoke over his attorneys, attempted to control the interview, and avoided answering pertinent questions to his case." However, he displayed "no

16

evidence of disorganization or psychosis," and when his attorney "firmly stated Mr. Cox's name in an attempt to re-direct him, he answered questions he previously avoided." Dr. Williams concluded that this behavior "demonstrated organization and retention of information, providing evidence contrary to severe psychiatric or memory dysfunction." She believed he could participate rationally in his own defense if he chose to do so.

At the second competency hearing, Dr. Williams testified that Cox once again gave poor effort on the testing measures she attempted to administer. During one of the evaluations, Cox asked her, "What if I was playing a game with you now like before?"; and during the interview portion of another evaluation he said, "You want to know why I did that last time? I am trying to get out, I got set up on a weak case, you've got to understand that." Her report noted that he was again able to participate in activities of daily living without assistance and that "[h]is thought content was devoid of any delusions, hallucinations, or bizarre thoughts," though his thought processes were slightly circumstantial[6]. As a result, he was not prescribed any medications upon discharge.

The defense's proof at the second competency hearing included testimony from Dr. Timothy Houchin (Dr. Houchin), a forensic psychiatrist that the defense retained to evaluate Cox for a major mental health disorder and

---

[6] Circumstantiality is defined by the American Psychological Association as "circuitous, indirect speech in which the individual digresses to give unnecessary and often irrelevant details before arriving at the main point." https://dictionary.apa.org/circumstantiality (last accessed Jan. 13, 2022).

17

make recommendations.  Dr. Houchin's examination was very limited, and he did not formally diagnose Cox with any mental health disorders, but he recommended a full neurological workup, including an MRI.  Cox's MRI revealed that his brain had shrunk and had sustained cell death.  Dr. Houchin could not say with certainty what caused the damage to Cox's brain, but remarked that it can be caused by excessive alcohol use over a long period of time.

Dr. Drogin also testified.  He opined that Cox was not competent to stand trial because he could not participate rationally in his own defense.  He based this conclusion on his observation of a meeting between Cox and his defense team.  During the meeting, counsel tried to discuss a possible plea deal and Cox's version of what occurred on the day of the crime.  Cox was responding "intermittently at best"; he kept talking about other topics and was unresponsive to counsel's attempts to redirect him.  He disagreed with Dr. Williams' conclusion that Cox was malingering notwithstanding her reports.

Several weeks after the second competency hearing, the trial court entered an order finding Cox competent to stand trial.  Cox later entered a conditional guilty plea and appealed.

Before the Court of Appeals, Cox argued that the trial court erred by failing to grant his motion to suppress on *Miranda* waiver grounds and by failing to grant his motion to suppress on invocation of counsel.[7]  Cox also

---

[7] *Cox v. Commonwealth*, 2019-CA-000931-MR, 2020 WL 4514696, at 2 (Ky. App. July 24, 2020).

18

disputed the trial court's finding of fact as to what he said during the portion of

the interview where he claimed he requested an attorney.[8]  The Court of

Appeals disagreed and affirmed the trial court.[9]  First, regarding Cox's *Miranda*

waiver argument, the Court of Appeals held:

> "The Constitution does not require that a criminal suspect know
> and understand every possible consequence of a waiver of the Fifth
> Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107
> S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987) (citations omitted).  Even
> Dr. Drogin testified Cox understood he had an attorney, he had
> some rights that had to be read to him, and anything said would
> be recorded against him according to a lawyer.  Although Dr.
> Drogin testified that a lot was missing from Cox's understanding of
> Miranda, Cox did not have to understand every consequence to
> validly waive his rights.  Based on the foregoing analysis, we hold
> the circuit court's finding of facts are supported by substantial
> evidence.  We further hold the circuit court correctly concluded
> Cox knowingly and intelligently waived his *Miranda* rights.[10]

Next, concerning Cox's invocation of counsel argument, the Court of Appeals

held:

> Upon review of the suppression hearing, it is clear the statement
> was partially inaudible.  Although Cox clearly said the word
> "lawyer," it is unclear what he uttered beforehand.  As such, the
> circuit court's finding of fact is supported by substantial evidence
> and is not clearly erroneous.[11]
>
> [. . .]
>
> [I]t is impossible to conclude Cox's partially inaudible statement
> constitutes a clear and unequivocal invocation of his right to
> counsel.  Under these circumstances, no reasonable officer would
> have understood the statement to be a request for an attorney.  As

---

[8] *Id.*

[9] *Id.* at *7.

[10] *Id.* at *4.

[11] *Id.* at *2.

such, the circuit court did not err in denying Cox's motion to suppress his confession.[12]

Cox then appealed to this Court. He renews his arguments that the trial court erred by failing to grant his motion to suppress on the grounds that he did not provide a knowing and intelligent waiver of his *Miranda* rights, and that the trial court erred by failing to grant his motion to suppress based on his invocation of counsel. We will address each in turn.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. Standard of Review

Both issues in this case require us to review the trial court's denial of a motion to suppress. Appellate courts review a trial court's ruling on a motion to suppress under a two-part analysis. The trial court's findings of fact are reviewed under the clear-error standard.[13] We accordingly defer to the trial court's fact finding if it is supported by substantial evidence.[14] Substantial evidence is "evidence, taken alone or in light of other proof, that a reasonable mind would find sufficient to support a conclusion."[15] We review the trial court's application of the law to the facts *de novo*.[16] This means we have "a

---

[12] *Id.* at *3.

[13] *See, e.g.*, *Dillon v. Commonwealth*, 475 S.W.3d 1, 9 (Ky. 2015).

[14] *See, e.g.*, *Payton v. Commonwealth*, 327 S.W.3d 468, 471 (Ky. 2010).

[15] *Goncalves v. Commonwealth*, 404 S.W.3d 180, 189 (Ky. 2013).

[16] *Dillon*, 475 S.W.3d at 10.

duty to make an independent evaluation of the record,"[17] and will give no deference to the trial court's ruling.

**B. Cox knowingly, voluntarily, and intelligently waived his *Miranda* rights.**

First, we will address whether the trial court erred by denying Cox's motion to suppress on the grounds that he did not knowingly and intelligently waive his *Miranda* rights. Prior to any custodial interrogation,[18] an individual must be apprised of his *Miranda* rights.[19] The individual "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently."[20] In order for a waiver to be considered valid, the Commonwealth "must show by a preponderance of the evidence that the defendant made an 'uncoerced choice' to abandon his constitutional rights."[21]

> The inquiry whether a waiver is coerced has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a

---

[17] *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)).

[18] This appeal does not involve a claim that Cox's interview with Detective Oliver was not a custodial interrogation. *See, e.g., Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006) ("[T]he threshold issue . . . in any case involving a perceived violation of *Miranda* rights[,] is whether the defendant was subject to custodial interrogation at the time he claims he was denied any of his *Miranda* rights.").

[19] *Miranda*, 384 U.S. at 444.

[20] *Id.*

[21] *Taylor v. Commonwealth*, 276 S.W.3d 800, 807 (Ky. 2008).

21

court properly conclude that the *Miranda* rights have been waived.[22]

Cox does not argue that his waiver was involuntary. The first prong of the test is therefore satisfied. The focus of our inquiry, then, is whether Cox understood both the nature of his *Miranda* rights and the consequences of abandoning them. To do that, we must consider the totality of the "particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused."[23]

In the trial court's order denying Cox's motion to suppress, it made several findings of fact which we hold were supported by substantial evidence. The court found that during the interview with Detective Oliver, Cox had his *Miranda* rights explained to him, and after being asked multiple times if he understood them, he indicated that he did. And, Detective Oliver testified that he had no reason to believe Cox did not understand his rights. The court acknowledged that Cox told Detective Oliver that he occasionally hears voices and experiences a "mental block," but it also found that Cox's "comments during the interview suggest that he understood why he was being questioned and the context of the situation at hand." We agree.

---

[22] *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) (internal quotation marks and citations omitted).

[23] *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). *See also Bartley v. Commonwealth*, 445 S.W.3d 1, 17 (Ky. 2014).

Before he was Mirandized, Cox provided his name, address, and date of birth. Cox acknowledged having "some beer" a "couple of hours" prior, but Detective Oliver did not smell alcohol on his breath and did not believe Cox was drunk based on his prior encounters with him. While Cox was being Mirandized, he asked "What's going on now?" twice, and claimed he used to be a lawyer. Nevertheless, he answered "Yeah" when asked if he understood his rights, and immediately thereafter claimed his innocence.

Throughout the interview it was difficult to keep Cox on topic, but Detective Oliver was consistently able to re-direct him and elicit responsive answers. Cox understood that he was being accused of inappropriately touching his niece. He further demonstrated that he understood the gravity of the accusation by stating several times that he was not a "child molester," and by denying the accusation until he was confronted with the evidence against him. Specifically, Cox first claimed that he only gave the child a hug. But when Detective Oliver told Cox that two witnesses as well as the victim had accused him of touching her on the vagina, Cox's story began to change. He next claimed that he made a mistake: he thought the victim was his girlfriend and touched her on her bottom. Finally, he said that he "probably" touched the victim on her vagina.

Regarding the expert testimony presented, the trial court found that Dr. Drogin testified that the examinations he administered to Cox "revealed a below-average mental capacity in areas such as concentration, short-term memory, and logical reasoning, and also showed that [Cox] was likely not

23

malingering." The trial court noted that the evidence presented at the first competency hearing from Dr. Williams indicated that he was malingering, but it did not make a finding as to whether Cox was in fact malingering.

The trial court further found that Cox's school records indicated that he was in special education classes and his IQ scores from that time indicated an IQ in the 60s range. Cox undoubtedly suffers from an intellectual disability. Notwithstanding, precedent from this Court is clear that a diminished intellectual capacity does not categorically prevent an individual from waiving his or her *Miranda* rights. For instance, in *Taylor v. Commonwealth*, we held that a juvenile with a low IQ who was in special education classes knowingly and intelligently waived his rights during a custodial interrogation.[24]

Dr. Drogin also testified that Cox showed a limited understanding of his *Miranda* rights. But the trial court concluded that Dr. Drogin's opinion was not binding in light of the fact that his observations "may not [have] sufficiently [reflected] his mental state and capacity at the time of the interview." It should also be noted that the Commonwealth did not offer expert testimony as to whether Cox could provide a knowing and intelligent waiver of his *Miranda* rights. Notwithstanding, when looking at the Commonwealth's evidence as a whole—in particular, Cox's behavior and statements during the interview, Dr. Williams' testimony, and Cox's criminal history—it was sufficient to rebut Dr. Drogin's opinion.

---

[24] 276 S.W.3d 800, 807 (Ky. 2008).

Finally, the trial court found that Cox had "an extensive criminal background and has been convicted of multiple felonies," which led it to conclude that he gave a knowing and intelligent waiver. Cox asserts that the trial court's reliance on his criminal record was error. We disagree. An individual's prior experience with law enforcement, or lack thereof, has been consistently cited as a proper factor to determine whether he knowingly and intelligently waived his *Miranda* rights. In *Bailey v. Commonwealth*, this Court discussed the factors it considered when deciding whether the defendant gave a valid waiver.[25] Those factors included the defendant's age, his intellectual disability, his mental condition, and that "he had no prior experience with law enforcement."[26] Likewise, in *Murphy v. Ohio*, the 6th Circuit found it significant that the defendant was "familiar with the procedures associated with police interrogation and the criminal justice process" when it held that he provided a valid waiver of his Miranda rights.[27] We will accordingly consider Cox's extensive criminal history as a factor that suggests he gave a knowing and intelligent waiver. However, we emphasize that a defendant's criminal

---

[25] 194 S.W.3d 296, 301 (Ky. 2006).

[26] *Id.*

[27] 551 F.3d 485, 514 (6th Cir. 2009). *See also, e.g., Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) ("Significantly, Mr. Smith had prior experience with the criminal justice system . . . The concepts encompassed by *Miranda* were not foreign to him."); *Moore v. Ballone*, 658 F.2d 218, 229 (4th Cir. 1981) ("Given his mental history, and his lack of any experience with law enforcement procedures as would be derived from a criminal record, the evidence is overwhelming that any waiver he gave the officers was invalid.").

25

history is not dispositive; it is but one factor to be considered under the totality of the circumstances.

The totality of the circumstances in this case can be summarized as follows. Cox is a middle-aged man with an intellectual disability and an extensive history of treatment for substance use disorder and several mental health disorders. However, none of the mental health experts that examined Cox in relation to this case diagnosed him with a mental health condition that would have prevented him from providing an adequate waiver of his *Miranda* rights. And, there was a plethora of evidence by Dr. Williams that suggested he has malingering symptoms of a mental health disorder. Further, Cox has an exceptionally extensive criminal history including several felony convictions. This suggests that the concepts embodied by the *Miranda* warnings were not foreign to him. Last, and most significantly, Cox told Detective Oliver that he understood his rights, and his behavior during the interview demonstrated that he understood why he was being questioned as well as the gravity of the situation.

Based on the foregoing totality of the circumstances we hold that the Commonwealth proved by a preponderance of the evidence that Cox understood both the nature of his *Miranda* rights as well as the consequences of waiving them. Accordingly, the Court of Appeals' holding is affirmed.

Nevertheless, clarity is needed regarding the Court of Appeals' reliance on *Colorado v. Spring.*[28] As we have previously mentioned, the Court of Appeals' analysis of this issue was as follows:

> "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987) (citations omitted). Even Dr. Drogin testified Cox understood he had an attorney, he had some rights that had to be read to him, and anything said would be recorded against him according to a lawyer. Although Dr. Drogin testified that a lot was missing from Cox's understanding of *Miranda*, Cox did not have to understand every consequence to validly waive his rights.[29]

This analysis is somewhat troubling and it compels us to emphasize that *Colorado v. Spring* also held a suspect must, at the very least, understand that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time," and "that whatever he chooses to say may be used as evidence against him."[30] We do not want our affirmation of the Court of Appeals' holding to be misconstrued as a departure from these requirements.

In *Colorado*, the defendant was implicated in two unrelated crimes: federal firearms charges and a murder.[31] The defendant waived his rights and agreed to speak to police about the firearms charges, but during that interview

---

[28] 479 U.S. 564 (1987).

[29] *Cox*, 2020 WL 4514696, at *4.

[30] *Colorado*, 479 U.S at 574.

[31] *Id.* at 566.

the police got him to confess to the unrelated murder.[32]  The defendant argued that his confession was invalid because he "was not informed that he would be questioned about the [murder]."[33]  The United States Supreme Court disagreed and held that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."[34]  Accordingly, when the Court held that a suspect need not understand "every possible consequence" of a waiver, it meant collateral consequences such as being questioned about a different crime.  It did not mean that the suspect need not understand that anything he says may be used against him.  We therefore do not affirm the Court of Appeals' holding because it was acceptable for Cox not to understand this consequence, as the holding seems to indicate.  Rather, based on the totality of the circumstances, we hold that he did understand it.

## C. The trial court applied a subjective standard in determining that a reasonable officer under the circumstances would not have understood the statement to be an invocation of counsel.

Next, we address whether the trial court erred by denying Cox's motion to suppress his interview on invocation of counsel grounds.

In the seminal case of *Edwards v. Arizona*, the United States Supreme Court held that "an accused … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the

---

[32] *Id.* at 567.

[33] *Id.* at 569.

[34] *Id.* at 574.

authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[35]  In order to trigger the protection of the *Edwards* Rule, a suspect's request for counsel must be "unambiguous and unequivocal."[36]  Stated differently, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents to not require the cessation of questioning."[37]  This means that, "[a]lthough a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[38]  Whether a suspect invoked his right to counsel is an objective inquiry.[39]

With that said, before proceeding, we must emphasize that this is not a run-of-the-mill invocation of counsel case.  In a typical invocation case, there is no question as to what a suspect said, nor is there a claim by the interviewing officer that he did not hear the suspect's invocation.  Normally, the suspect's

---

[35] *Edwards*, 451 U.S. at 484-85.

[36] *Dean v. Commonwealth*, 844 S.W.2d 417, 420 (Ky. 1992).  *See also Davis v. United States*, 512 U.S. 452, 459 (1994) ("We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney.").

[37] *Davis*, 512 U.S. at 459.

[38] *Id.* (internal citation and quotation marks omitted).

[39] *Id.*

statement to the officer is clear, and the appellate court's job is to determine whether that statement was unambiguous and unequivocal. Here, the Commonwealth argues that Cox's statement was ambiguous, both because of *what* he said, and because Detective Oliver *misheard* what he said. The former argument, that the statement itself was ambiguous, is easily addressed using well-tread precedent. The latter argument, however, is a matter of first impression for this Court. Specifically, if a suspect makes an otherwise unambiguous and unequivocal statement that he wishes to have counsel present, is that invocation of counsel rendered ambiguous and equivocal because of the interviewing officer's failure to hear or understand it? Unsurprisingly, the case law needed to address this issue, from both this Court and that of our sister states, is extremely scant. However, we feel that the principles set forth by the well-reasoned opinion of the Supreme Court of Minnesota in *State v. Chavarria-Cruz*,[40] as discussed below, are useful guideposts in resolving this uncommon matter.

To begin, we must address Cox's argument that the trial court's finding of fact regarding what he actually said during his alleged invocation of counsel was clearly erroneous. In its order denying his motion to suppress, the trial court found that Cox told Detective Oliver, "So when they try to accuse me of doing something [inaudible] talk to a [expletive] lawyer. I'm serious, man." But

---

[40] 784 N.W.2d 355 (Minn. 2010).

Cox contends that the audio of the interview establishes that he said, "*want* to talk to a goddamn lawyer. I'm serious man."

Based on this Court's review of the audio from the suppression hearing, it sounds as though Cox said, "So when they try to accuse me of doing something, I ain't do it man. Want to talk to a goddamn lawyer. I'm serious man." In addition, a transcription of the interview was included in the record. The transcription was created by a third-party transcription company, and appears to be provided in lieu of a video recording of the full interview. However, it does not appear that the trial court had the benefit of this transcript. The transcription provides that Cox said, "So they're trying to accuse me of doing something I ain't doing, man. Want to talk to a goddamn lawyer. I'm serious man."

Notwithstanding, this Court is bound by its deference to the trial court's fact finding. We must uphold the trial court's finding of fact if it is supported by "evidence, taken alone or in light of other proof, that a reasonable mind would find sufficient to support a conclusion."[41] Under this standard of review, we are unable to conclude that the trial court's finding of fact was clearly erroneous. Accordingly, our analysis will proceed from the premise that Cox's statement was: "So when they try to accuse me of doing something [inaudible] talk to a goddamn lawyer. I'm serious, man."

---

[41] *Goncalves*, 404 S.W.3d at 189 (defining "substantial evidence").

Next, we will address: (1) whether Cox's statement was an unambiguous and unequivocal request for counsel; and (2) whether a reasonable officer under the circumstances would have understood the statement to be a request for counsel.

In previous cases, we have held that the following statements were insufficient to invoke a suspect's right to counsel: "Should, should I, should I have somebody here? I don't know";[42] "Do I need to get an attorney for this because I'm really concerned?"[43]; "[C]an I tell my lawyer the real story and he tell y'all?";[44] and "If I want a lawyer how soon could you make that happen?"[45] Similar statements such as "Maybe I should talk to a lawyer,"[46] and "I guess you'll just have to go on and lock me up then and call my lawyer, cause I don't know what you're talking about"[47] have been deemed too ambiguous to constitute an invocation of counsel by the United States Supreme Court and the 6th Circuit, respectively.

In contrast, in *Bradley v. Commonwealth*, we held that the statement "Well, you know, I need a lawyer or something" was an unequivocal and unambiguous request to have counsel present.[48] The statements "I want to

---

[42] *Dean*, 884 S.W.2d at 420.

[43] *Ragland v. Commonwealth*, 191 S.W.3d 569, 587 (Ky. 2006).

[44] *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 34 (Ky. 2011).

[45] *Brown v. Commonwealth*, 416 S.W.3d 302, 308 (Ky. 2013).

[46] *Davis*, 512 U.S. at 465.

[47] *England v. Hart*, 970 F.3d 698, 708 (6th Cir. 2020).

[48] *Bradley v. Commonwealth*, 327 S.W.3d 512, 518 (Ky. 2010).

talk to a lawyer before I do anything,"[49] and "I need to call my attorney"[50] have also been held to be an invocation of counsel.

Here, Cox's statement "talk to a goddamn lawyer.  I'm serious man" is more akin to the statements we have held to be an invocation of counsel.  It is forceful, adamant, and contains no tentative language such as "maybe" or "might."[51]  The point at which it occurred in the interview is also significant.  After obtaining some preliminary information, Detective Oliver Mirandized Cox.  Immediately thereafter, the following exchange occurred:

> **A:** You got to understand, I ain't done nothing.
> **Q:** Okay.
> **A:** You come to my house and pulled me out.
> **Q:** Well, we just wanted to bring you down here to talk, so let's talk.  Why do you think the police got called today?  Why are we here in this moment?
> **A:** I don't know.
> **Q:** You don't know?  Do you have any idea?
> **A:** Joey—what it was, Joey thought I was trying to grab my [niece's] so-and-so.
> **Q:** Okay.  So, who thought this?
> **A:** Joey did.
> **Q:** Joey did?
> **A:** Yeah.  So I reached down in pocket and grabbed—grabbed a dollar out and I said, here, you can have it.
> **Q:** Right.
> **A:** Let me stand up for a minute I've got two pair of britches on.
> **Q:** Uh-huh.
> **A:** I pick up pennies all the time.
> **Q:** Sure.
> **A:** And I'm looking around.  He comes to my house and gets ten dollars of my money out of my pocket.
> **Q:** Right.

---

[49] *Quarles v. Commonwealth*, 2016-SC-000684-MR, 2017 WL 6379446, at *2 (Ky. Dec. 14, 2017).

[50] *Tooley v. Commonwealth*, 2010-CA-000289-MR, 2012 WL 1137845, at *6 (Ky. App. Apr. 6, 2012).

[51] *See Bradley*, 327 S.W.3d at 517-18.

**A:** I passed out, I go to sleep.  I don't bother nobody.
**Q:** Okay.  So Joey thought that, that you tried touching, who was it?
**A:** Amber.
**Q:** Amber?
**A:** Yeah.  So when they try to accuse me of doing something [inaudible] talk to a goddamn lawyer.  I'm serious, man.
**Q:** Sure.  Okay.  That's fine.[52]  So why—why did Joey think that?

So, when Cox made his alleged invocation of counsel he had just been Mirandized.  He then acknowledged the allegation against him, but claimed his innocence.  It can be discerned, then, that when he said "they try to accuse me of doing something" he was talking about being wrongfully accused of inappropriately touching his niece.  And, therefore, the statement "talk to a goddamn lawyer.  I'm serious man" meant that Cox wanted to talk to an attorney regarding the allegations against him in this case.  Accordingly, based on both the statement itself and the full context in which it was made,[53] we hold that Cox's statement was unambiguous and unequivocal.

Finally, we must determine whether a reasonable police officer under the circumstances would have understood Cox's statement to be a request for an attorney.  As noted, we feel that the analysis employed by the Minnesota Supreme Court is useful in addressing this novel issue.

---

[52] Detective Oliver testified that his response to Cox's statement was a conversational "filler" rather than a direct response to what he said.  We have no basis to conclude otherwise.

[53] *See id.* at 517.

In *Chavarria-Cruz,* the defendant Jose Miguel Chavarria-Cruz (Chavarria-Cruz) filed a pre-trial motion to suppress his statement to police on the grounds that it was obtained in violation of his right to counsel.[54]  During a custodial interrogation, Chavarria-Cruz said to a detective, "I'm cooperating here, if I could just be like, you know, get me a lawyer" but the detective did not stop the interview.[55]

At the suppression hearing on Chavarria-Cruz's motion, the detective recounted his recollection of the interview.[56]  The detective noted that Chavarria-Cruz was "very soft spoken" and "had a pronounced [Spanish] accent."[57]  The detective also "testified that he did not recall Chavarria-Cruz using the word 'lawyer' during the course of the interview.  Upon review of the tape recording, however, [the detective] conceded that there was 'no doubt' that Chavarria-Cruz mentioned a lawyer, although the words preceding 'lawyer' [were] difficult to discern."[58]

Ultimately, the trial court "was persuaded that it was difficult to hear what the defendant said on that one part" and therefore did not suppress the statement.[59]  Chavarria-Cruz was convicted following a jury trial.[60]  The

---

[54] *Chavarria-Cruz,* 784 N.W.2d at 359.

[55] *Id.* at 360.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 361.

[60] *Id.* at 359.

Minnesota Court of Appeals later upheld the trial court's ruling.[61] It held: "A statement that is inaudible to an interrogating officer cannot reasonably be construed by the officer to be an invocation of the right to counsel because a statement that is inaudible presents nothing for the officer to construe."[62]

The Supreme Court of Minnesota rejected the rulings of both the trial court and the court of appeals because they

> approached the admissibility of Chavarria–Cruz's statements by asking a subjective question: Whether [the detective] in fact heard Chavarria–Cruz invoke his right to counsel . . . essentially creating an exception to the objective, "reasonable officer" analysis for cases where the officer testifies that the suspect's statement was spoken too quietly to be heard.[63]

The Court went on to emphasize the importance and practicality of an objective approach to the issue, and then held:

> The question answered by the court of appeals in this case—whether the district court erred in concluding that [the detective] did not hear Chavarria–Cruz's request for a lawyer—is not the dispositive question in this appeal because the objective test applies. We must instead ask whether, in light of all the circumstances, a reasonable officer would have heard Chavarria–Cruz's request. This is the question the district court should have considered here . . . A "reasonable officer" is one with ordinary hearing abilities who has taken steps to ensure that clear communication can occur between the officer and the suspect. Further, the reasonable officer is attentive to the suspect's answers to questions.[64]

---

[61] *Id.* at 362.

[62] *Id.*

[63] *Id.*

[64] *Id.* at 362-63.

The Court ultimately held, based on the totality of the circumstances surrounding the interview, that a reasonable officer would have heard Chavarria-Cruz's request for counsel.[65]

In this case, the trial court found that "[e]ven though [Cox] may have said that he wanted to talk to a lawyer . . . it was [not] unreasonable for Det. Oliver either to have misheard the Defendant's statements or to have placed them in a different context at that time." This subjective analysis was error. Rather than addressing whether it was unreasonable for Detective Oliver to mishear or misunderstand Cox's statement, the focus should have been on whether a reasonable officer under the circumstances would have heard and understood Cox's statement to be a request for counsel. A "reasonable officer," in turn, "is one with ordinary hearing abilities who has taken steps to ensure that clear communication can occur between the officer and the suspect. Further, the reasonable officer is attentive to the suspect's answers to questions."[66]

To be clear, our holding today does not overrule the precedent set by *Dean v. Commonwealth*, which held that an interviewing officer is not required to ask follow-up questions to clarify an ambiguous statement that could arguably be construed as a request for counsel.[67] That holding applies in the

---

[65] *Id.* at 365.

[66] *Id.* at 363.

[67] *Dean*, 884 S.W.2d at 420 (discussing and rejecting an approach requiring that "when an accused makes an equivocal statement that 'arguably' can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to 'clarify' the earlier statement and the accused's desires respecting counsel[.]").

context of a "typical" invocation of counsel case wherein the officer heard and understood the suspect's alleged invocation of counsel. There is a clear distinction between not requiring an interviewing officer to ask clarifying questions when the officer hears and understands the suspect's ambiguous statement, and requiring the officer to clarify what a suspect said when the officer did not hear or understand the statement in the first place.

With that said, the trial court was not afforded the opportunity to apply this newly adopted standard to the case at bar. We therefore remand this case with instructions that the trial court re-address Cox's motion to suppress on invocation of counsel grounds by applying the reasonable officer standard adopted herein.

### III. CONCLUSION

For the foregoing reasons, Cox's convictions for first-degree sexual abuse and second-degree PFO are vacated. This matter is hereby remanded to the circuit court with instructions to reconsider Cox's invocation of counsel argument, and for any further proceedings consistent with this opinion.

All sitting. Minton, C.J.; Hughes, Keller, Lambert and Nickell, JJ; concur. Conley, J., concurs in part, dissents in part, by separate opinion, in which VanMeter, J., joins.

CONLEY, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with the conclusion of the Court as to the issue of Cox's waiver of *Miranda* rights. With due respect, however, I dissent from the second

38

conclusion which announces a new rule for law enforcement that a clear and unequivocal, but otherwise inaudible, invocation of counsel must be clarified by an interrogating officer.

This is a very tough case. The Court has concluded that Cox made an unambiguous and unequivocal invocation of counsel. At the time, however, the interrogating officer simply did not understand him. Because of that, we now hold the officer should have ceased the interrogation to clarify what Cox said. We have the benefit of that interrogation being recorded, but I confess that I have listened to the pertinent portion several times and I cannot say that I understand what Cox said. The trial court understood most of the statement, but determined a crucial part was inaudible. To settle this confusing circumstance, the Court concludes an objective inquiry is demanded as to whether a reasonable officer would have understood Cox under the totality of circumstances. In so doing, I believe it has not given the consideration to the interrogating officer's position that we should; consequently, a crucial aspect of this field of law is overlooked.

The "fundamental purpose" of the Supreme Court of the United States' decision in *Miranda v. Arizona*, was to secure for the accused an unfettered right to choose between speech or silence. *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987). "To this end, the *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights from the government 'compulsion, subtle or otherwise,' that 'operates on the individual to overcome free choice in producing a statement after the privilege has been

once invoked.'" *Id.* (internal citation omitted). The prohibition upon further interrogation once a suspect has invoked his right to counsel is one of these prophylactic rules. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Indeed, the right to counsel under the Fifth Amendment is itself a prophylactic rule. *Davis v. United States,* 512 U.S. 452, 457 (1994). "It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." *Barrett,* 479 U.S. at 528.

The Supreme Court of the United States has made clear that the "need for effective law enforcement" is a consideration which counterbalances the application of the prophylactic rules. *Davis,* 512 U.S. at 461. It has warned,

> [t]he rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity. . .'

*Id.* (quoting *Michigan v. Mosely,* 423 U.S. 96, 102 (1975)).

There is no allegation of coercion or compulsion in the case before us. Thus, the prophylactic purpose behind the *Miranda* and *Edwards* rules are not squarely before us, though we must be mindful of future applications of precedent. I do not believe we should so lightly disregard the officer's testimony

that he did not understand Cox, and the trial court's conclusion that this claim was not unreasonable. The functional difference between an audible but ambiguous invocation of counsel and an inaudible but unambiguous invocation is nil. In either case, law enforcement is left in the same lurch—"to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis*, 512 U.S. at 461. To avoid putting law enforcement in that predicament, the Supreme Court declined to hold that clarifying questions need be asked by police when the accused has made an ambiguous invocation of counsel. *Id.* Our own decision in *Dean v. Commonwealth*, 844 S.W.2d 417 (Ky. 1992), anticipated that ruling by two years.

Therefore, I would decline to lay down a blanket rule as the Court does today. Instead, the issue is intensely case specific. Where, as here, the trial court concludes that an officer could not reasonably understand the invocation, and there is no evidence of coercion or compulsion in an attempt to overcome the accused's will, then the balance of interests does not favor suppression. The prophylactic purpose has little bearing in such circumstances therefore suppression would be "irrational[.]" *Davis*, 512 U.S. at 460. But where a trial court determines an officer's claim of inaudibility of the invocation is unreasonable, then the prophylactic purpose gains greater import. If additional facts indicate or demonstrate a measure of coerciveness or compulsion contra *Edwards*, then suppression would be the favored conclusion.

The facts of this case lead me to conclude the prophylactic purpose of *Edwards* is not present. I see no need to apply it, much less extend the rule as the Court does today. I, therefore, dissent and would uphold Cox's conviction.

VanMeter, J., joins.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Robert Lee Baldridge
Assistant Attorney General