Joshua W. BAILEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2003–SC–0935–DG.

Supreme Court of Kentucky.

June 15, 2006.

Julie Namkin, Department of Public Advocacy, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, George G. Seelig, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellant, Joshua W. Bailey, was indicted by the Allen County grand jury on charges of first-degree sexual abuse against a minor less than twelve years of age. A lengthy suppression hearing was held at which the trial court suppressed the introduction of Appellant's statements to police investigators. The Court of Appeals reversed the ruling. This Court granted discretionary review.

A detailed explanation of the facts and a description of Bailey himself are necessary to the determination of this matter. Bailey, who was nineteen at the time of the alleged incident, is classified as moderately mentally retarded. He has an IQ of 50, which places him in the bottom .07% of the population. According to testimony presented at the suppression hearing, Bailey's mental ability is equivalent to that of a six-year-old child. He is illiterate and left school in the ninth grade.

The charges in this case arise from allegations made by a six-year-old child, L.J., claiming that Bailey "hurt her" when he was caring for the child. Bailey's uncle was dating L.J.'s mother, who asked Bailey to babysit her three daughters while the two went out on a date. L.J.'s mother first learned of the claims when her three-year-old daughter told her that Bailey had "made a hole" in L.J. L.J.'s older sister, then ten years old, confirmed that Bailey had taken the girl into a bedroom and shut the door, and that she heard her sister screaming in the closed bedroom the entire time. Upon learning of the allega-

tions, the children's mother contacted social services.

Some four months later, Detective Woods of the Allen County Sheriff's office contacted Bailey concerning the allegations. Bailey denied any wrongdoing at that time, and declined the detective's request to submit to a polygraph exam. Detective Woods then told Bailey that, if he didn't take the exam, he would be forced to rely on the girl's statement and Bailey would "probably" be arrested. Bailey did agree to the exam at that time, though when the detective called back to schedule it, Bailey changed his mind. Later, Detective Woods visited Bailey at home again, and Bailey again expressed his reluctance to take the exam. Before departing, Detective Woods reminded him that he would likely be arrested if he didn't take the exam; Bailey called Detective Woods about an hour after his departure and agreed to the exam.

On March 1, 2001, Bailey was driven to the Allen County Sheriff's Department where he was met by Sheriff Foster. Sheriff Foster then drove Bailey to Madisonville, some two hours away, for the examination. John Bruner, a civilian employee of the Kentucky State Police, administered the polygraph exam.

During the pre-polygraph interview, Bruner first advised Bailey of his rights pursuant to an "agreement to take polygraph examination," which includes a recitation of the *Miranda* rights. Bailey had substantial difficulty understanding these rights; he replied that he understood the right to remain silent as meaning "you are going to jail," and the right to a public defender as meaning "you are in trouble." When advised of his right to an attorney, Bailey inquired what "an atturnity" is. After about fifteen minutes of discussing his rights, Bruner instructed Bailey to sign his name on the form.

During a series of control questions at the outset of the exam, Mr. Bruner elicited general background information from Bailey. Bailey revealed that he quit school in the ninth grade, was unemployed, was in special education classes in school, and that he had absolutely no prior experience with law enforcement.

Bruner then questioned Bailey about the case, mainly through a series of "yes" and "no" questions. Bailey answered questions indicating that he did babysit the three sisters while his uncle went out with the girls' mother. He denied taking the alleged victim into a bedroom and shutting the door, and denied touching the girl sexually. When asked why the child would make such allegations, Bailey opined that the girl was mad at him for making her go to bed early.

After about an hour, Bruner took a short break. Before re-starting the examination, Bruner asked Bailey if he remembered his rights. Bailey was at first confused, but then replied in the affirmative. Mr. Bruner then reviewed the questions that would be on the exam. Again, Bailey denied touching the girl sexually. He further denied putting his penis inside her or between her legs.

Bailey was hooked up to the polygraph machine. Mr. Bruner then ran a control test to see how the machine would register a lie from Bailey, which consisted of Bailey writing a number in the center of the page then denying that he had written the number. Bailey had significant difficulty following these directions. The examination itself was started nonetheless.

At this point, nearly two hours into the examination process, Mr. Bruner left the room. When he returned, he showed Bailey the polygraph charts and told him that he was not "being totally honest" during the exam. Bruner's tone changed markedly at this point: while he had previously accepted Bailey's denials with mild skepticism, his attitude now reflected the position that the results of the polygraph exam indicated conclusively that Bailey was lying. Bruner began pressing Bailey with questions that began with statements such as, "I know you're lying" and "this machine has told me you are lying." Bailey nodded his head in agreement to each of these statements.

Bruner then spent some time explaining to Bailey why it is important to tell the truth, reminding him that all people make mistakes in their lives. Bruner also told Bailey that something had happened with the child, and that it was important for Bailey to be honest. He reminded Bailey that the machine said he was lying. He began offering possible scenarios by which Bailey might have touched L.J. inappropriately, while continuously reminding Bailey that he "knew" that something bad had happened. Finally, Bruner suggested that perhaps Bailey had "rubbed" his penis on the girl or touched her with his hands. Bailey responded that perhaps he had touched the girl when he went to change her clothes, but that he didn't mean to do that.

Unsatisfied, Bruner continued questioning Bailey although the polygraph machine was no longer hooked up. Bailey continued to deny having touched the girl and denied having put his penis on her. During these denials, Bruner repeatedly accused Bailey of lying to which Bailey sometimes responded that he was "real nervous." By this point in the examination, Bailey had expressly denied various suggestions of wrongdoing no less than thirty times. Bruner rejected each of Bailey's denials by countering with the results of the polygraph examination.

Finally, Bruner suggested two scenarios: "I don't know if you put your penis all

the way into her, or if you just rubbed it over her vagina. But your penis came in contact with her somehow—you tell which how." Bailey replied, "Maybe I rubbed it on her ... but only because I didn't know what I was doing." Bruner then asked, "So you rubbed it on top of her panties" and Bailey responded, "Yeah." Bailey denied having penetrated the child. This confession lasted approximately two or three minutes. The majority of the incriminating statements were elicited in the form of "yes" or "no" questions.

Following this confession, Bailey was driven back to the Allen County Sheriff's office where he was met by Detective Woods. Bruner had told Bailey that he "needed" to talk to Detective Woods; when Woods asked Bailey if he wanted to talk about the exam, Bailey responded "yes, I need to." After spending about a minute or two reviewing the *Miranda* rights, Bailey agreed to give a taped statement reciting what he had told Bruner. Bailey offered a very brief confession, again largely by answering "yes" or "no" to questions posed by Detective Woods. He was thereafter arrested.

■ Defense counsel moved to suppress the confession. Following a four-hour suppression hearing, the trial court granted the motion. The Commonwealth appealed, and the Court of Appeals reversed. This Court granted discretionary review. The Commonwealth bears the burden of establishing the voluntariness of a confession by a preponderance of the evidence. *Tabor v. Commonwealth*, 613 S.W.2d 133, 134 (Ky.1981). If supported by substantial evidence, the trial court's conclusion regarding the voluntariness of the confession is conclusive. *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999).

■ The Due Process Clause of the Fourteenth Amendment prohibits the ad-

mission of involuntary confessions: "[if the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of [the] confession offends due process." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). "The voluntariness of a confession is assessed based on the totality of the circumstances surrounding the making of the confession." *Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky.1999). However, the threshold question to a voluntariness analysis is the presence or absence of coercive police activity: "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986). Section 11 of the Kentucky Constitution also requires state action before a confession may be deemed involuntary. *Commonwealth v. Cooper*, 899 S.W.2d 75, 76 (Ky.1995).

■ The U.S. Supreme Court has described the "ultimate test" of the voluntariness of a confession as follows: "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047, 36 L.Ed.2d at 862 (internal citations omitted). Accordingly, in assessing voluntariness, "both the characteristics of the accused and the details of the interrogation are considered." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. When examining the characteristics of the accused, reviewing courts consider such factors as age, education, intelligence, and linguistic ability. *Allee v. Commonwealth*, 454 S.W.2d 336, 341 (Ky.1970). Factors relevant to a characterization of the interrogation include the length of detention, the lack of any advice to the accused concerning his con-

stitutional rights, the repeated or prolonged nature of the questioning, and the use of overtly coercive techniques such as the deprivation of food or sleep, or the use of humiliating tactics. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. This Court has succinctly summarized the relevant inquiry to determine voluntariness as follows: "(1) whether the police activity was 'objectively coercive'; (2) whether the coercion overbore the will of the defendant; and (3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." *Henson*, 20 S.W.3d at 469.

■ Turning to the present matter, we analyze first the characteristics of the accused. The evidence presented at the suppression hearing revealed that Bailey was nineteen at the time of the confession, that he had received special education until the ninth grade at which point he dropped out of school, and that he had no prior experience with law enforcement. The foremost characteristic for our consideration, however, is Bailey's mental condition.

At the suppression hearing, the defense presented the expert testimony of Mrs. Patricia Guthrie, an educational consultant and certified school psychologist. According to her testimony, which was not controverted by the Commonwealth, Bailey labors under a very serious mental deficiency. His IQ of 50 places him in the lowest .07% of the population. While Bailey does not have any outward or physical features identifying his mental deficiency, he nonetheless functions at the level of an average six-year-old child. On standardized tests designed to assess a person's comprehension and vocabulary, Bailey received the lowest possible score. On those tests designed specifically to evaluate Bailey's ability to make predications based on information presented to him, he likewise received the lowest possible score.

A large portion of Mrs. Guthrie's testimony concerned Bailey's social and adaptive skills. Through her testing of Bailey and her review of the videotaped polygraph examination, she noted that Bailey had excellent social skills; that is, Bailey's ability to maintain eye contact and hold a conversation with an adult evidenced an advanced level of social adaptation. However, Mrs. Guthrie was clear in cautioning that Bailey's adaptive behaviors are in no way an indication of his level of understanding. In fact, the crux of her testimony was that Bailey, like others with similar mental deficiencies, has developed the ability to hold congruent conversations by repeating back what the speaker has said, and by reading body language and tone of voice. His foremost desire is to be compliant and to act appropriately, particularly with authority figures, even though he likely does not understand the substance of what is being told to him. She warned that, in situations like an interrogation, Bailey is very prone to agree with whatever is suggested because "to say otherwise indicates some kind of non-compliance or inappropriate behavior because he has been taught that to be [that way] . . . he has learned that being nice helps and works."

Taking the aforementioned factors surrounding Bailey's mental status into consideration, we must next consider "how those factors relate to the police tactics utilized during the interrogation." *Rogers v. Commonwealth*, 86 S.W.3d 29, 35 (Ky. 2002). Furthermore, we must analyze the police action from an objective standpoint. *Henson*, 20 S.W.3d at 469. Relying primarily on *Colorado v. Connelly* and its progeny, the Commonwealth argues that there was no evidence of police coercion and, absent such action, a confession can-

not be deemed involuntary. *Id.* In support of this argument, the Commonwealth points to the trial court's findings of fact, which specifically found no evidence of physical coercion or duress, deprivation of human necessities, or other improper threats. Our review of the record does not indicate otherwise. However, the Commonwealth's position obscures the widely-recognized belief that coercion can be psychological as well as physical. *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1252–53, 113 L.Ed.2d 302, 316 (1991).

The mere absence of certain police behavior that has, in the past, been found so inherently coercive as to render a confession involuntary does not automatically resolve the issue of voluntariness in this case. Voluntariness cannot be determined by reference to a simple list of requisite behaviors. The Supreme Court has explained that there is "no talismanic definition of 'voluntariness' mechanically applicable to the host of situations where the question has arisen." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. at 2046, 36 L.Ed.2d at 861. Rather, the notion of voluntariness is "itself an amphibian," reflecting "an accommodation of the complex of values implicated in police questioning of a suspect." *Schneckloth,* 412 U.S. at 224–25, 93 S.Ct. at 2046, 36 L.Ed.2d at 861. Use of a totality of the circumstances analysis embodies this belief that voluntariness cannot "[turn] on the presence or absence of a single controlling criterion" but rather a "careful scrutiny of all the surrounding circumstances." *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. This case justifies the rationale underlying the use of the totality of the

circumstances approach: it is simply impossible to evaluate the police action outside the lens of Bailey's very serious mental deficiency, which necessarily calls into question his ability to give a reliable confession.[1] This Court is not alone is taking the accused's mental status into consideration when evaluating the totality of the circumstances: "[w]hen persons of markedly limited mental ability ... are questioned without the aid of counsel, issues of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances." *Henry v. Dees,* 658 F.2d 406, 411 (5th Cir.1981) (internal citations omitted). Furthermore, "[w]hen a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a 'lesser quantum of coercion' is necessary to call a confession into question." *Hill v. Anderson,* 300 F.3d 679, 682 (6th Cir.2002). *See also Connelly,* 479 U.S. at 164, 107 S.Ct. at 520, 93 L.Ed.2d at 482 (noting that psychological status of accused is a factor in assessing voluntariness).

Bearing these principles in mind, we are compelled to agree with the trial court's conclusion that an examination of the totality of the circumstances indicates that Bailey's will was overborne and the tactics used by the police officers critically impaired his capacity for self-determination. As explained by Mrs. Guthrie's testimony, a characteristic of persons with Bailey's mental capacity is their sincere desire to please authority figures and their tendency to comply with instructions or suggestions without any consideration of the substance of such instructions or the fact that compliance might not be in their self-inter-

---

1. Consideration of Bailey's mental status, though, in evaluating the police action should not be considered a subjective analysis of coercive behavior: we are not analyzing whether *Bailey* believed he was being coerced, but simply determining whether the officers' actions were objectively coercive *in light of* Bailey's mental deficiency.

est. There is substantial evidence in the record supporting the trial court's conclusion that Bailey eventually confessed simply because he was repeatedly accused by an authority figure of lying, and he perceived his "confession" as a way to satisfy Bruner. Between the officers' initial contact with Bailey and his eventual confession during the polygraph examination, Bailey expressly denied ever touching L.J. at least forty times to at least three different law enforcement officers. Bailey finally confessed only after being heatedly accused by Bruner who, up until the latter part of their meeting, had taken a fatherly demeanor with Bailey. Furthermore, Bailey only confessed when he was confronted with the results of the polygraph exam, which were presented to Bailey as conclusive proof that he was lying. Most importantly, we cannot ignore the fact that nearly all of Bailey's Initial "confession" consisted of Bailey parroting suggestions that had been offered by Bruner moments before. While such techniques might be appropriate and uncoercive in other situations, Mrs. Guthrie's testimony made it clear that such tactics, here, rendered Bailey's confession completely unreliable. When analyzed in light of Mrs. Guthrie's description of Bailey's mental ability, we must agree with the trial court's determination that the techniques used by Bruner sufficiently overbore Bailey's will.

■ We also cannot ignore the fact that Bruner and Detective Woods were aware that Bailey was, to some extent, mentally deficient. *Cf. Rogers v. Commonwealth*, 86 S.W.3d 29 (Ky.2002). Bruner was specifically informed that Bailey had no education past the ninth grade, and that he had been in special education classes during the entirety of his short academic career. Moreover, the nature and substance of Bailey's responses made clear that he was seriously mentally deficient. Bailey referred to an attorney as "an atturnity"; he responded that a "vagina" is "where a girl goes to the bathroom"; he was unable to accurately relay his *Miranda* rights mere minutes after Bruner had explained them; he had difficulty following directions to write a two-digit number on a piece of paper; he was unable to write his name in cursive; he wavered for several minutes when asked his year of birth; he understood his right to counsel as meaning that he was "in trouble." Finally, Bruner's own demeanor during the two-hour examination makes plainly evident that he was aware that Bailey was mentally deficient to some extent: Bruner explained the testing process and the instructions to Bailey in extremely simplistic tones; he constantly reiterated statements and directives to Bailey in an effort to increase his comprehension; and he spoke with Bailey in a tone of voice characteristic of a person communicating with a very small child. As recognized by other courts, the evident nature of Bailey's mental deficiency bears on our analysis: "[I]f mental impairment of whatever kind should have been reasonably apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary." *U.S. v. Sablotny*, 21 F.3d 747, 752 (7th Cir.1994).

Finally, other factors support the trial court's determination that the police action, in these circumstances, was psychologically coercive. On the day of his confession, Bailey was alone in the company of law enforcement for nearly seven hours before giving his confession. Due to his mental retardation, Bailey did not have a driver's license and was picked up at his home by police officers and driven first to the Sheriff's office and then to Madisonville, a two hour drive from Bailey's home. We also must take into consideration Bailey's complete inability to understand his

*Miranda* rights. *See Rogers,* 86 S.W.3d at 35. ("Appellant's understanding of his *Miranda* rights is relevant . . . as part of the totality of the circumstances.") Aside from Mrs. Guthrie's testimony that Bailey lacked the mental capacity to comprehend the concepts embodied in the *Miranda* warnings, his responses to Bruner confirm that he lacked any understanding of these rights. Finally, we again note that Bailey had absolutely no prior experience with law enforcement.

■ Nonetheless, we must acknowledge what has been recognized by both the trial court and the Court of Appeals in this case: the circumstances of Bailey's confession create a very "close" question for judicial determination. Because adjudication of this matter depends so implicitly on an interpretation of the facts surrounding Bailey's confession, we are particularly mindful of the trial court's conclusions. This Court has explained on countless occasions why substantial deference is afforded to the trial court's resolution of factual matters: "deference to the trial court's factual findings and ruling in such matters as evidentiary questions is *required* because the trial court is in the best position to evaluate the evidence." *Miller v. Eldridge,* 146 S.W.3d 909, 917 (Ky.2004) (emphasis added); CR 52.01 ("due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses"). Moreover, we note that the trial court expressly stated in its order to suppress that its decision was based, in part, on its observations of and interactions with Bailey during a four-hour suppression hearing.

Having thoroughly reviewed the record in its entirety, we conclude that the trial court's decision was based on substantial evidence, including the testimony of Mrs. Guthrie and the undisputed circumstances of Bailey's confession. Furthermore, the trial court did not misapply the law to its factual findings. The trial court conducted an analysis of the totality of the circumstances, and its conclusion that the techniques used to elicit the confession were coercive in light of Bailey's seriously deficient mental capacity is supported by both Kentucky and federal law. Accordingly, the decision of the Court of Appeals is reversed and the Order of the Allen Circuit Court suppressing Bailey's confession is reinstated.

LAMBERT, C.J.; COOPER, ROACH, and SCOTT, JJ., concur.

GRAVES and WINTERSHEIMER, JJ., dissent because there was no coercive police activity as required by *Morgan v. Commonwealth,* 809 S.W.2d 704 (Ky.1991) or *Henson v. Commonwealth,* 20 S.W.3d 466 (Ky.1999).