RENDERED: SEPTEMBER 2, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0084-MR

TAVION MILEY                                                    APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE CHARLES L. CUNNINGHAM, JR., JUDGE
ACTION NO. 18-CR-001518

COMMONWEALTH OF KENTUCKY                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: Tavion Miley has directly appealed from the judgment of

the Jefferson Circuit Court finding him guilty of first-degree manslaughter and

first-degree robbery, and sentencing him to 18 years' imprisonment. On appeal,

Miley challenges the orders denying his motion to suppress statements he made

during an interrogation and transferring him to circuit court to be tried as a

youthful offender pursuant to Kentucky Revised Statutes (KRS) 635.020(2) and KRS 640.010(2). We affirm.

On the night of July 24, 2017, Miley, who was 17 years old, and several other juveniles robbed and beat Lonnie Baird to death in an alley. A cell phone was stolen during the incident, and it was recovered in Miley's possession two days later. The Uniform Citation completed by Louisville Metro Police Department (LMPD) Detective Micah Cohn originally charged Miley with murder and three counts of first-degree robbery and set forth the following factual basis for the charges:

> Subject was present and participated in an assault on an elderly victim with injuries that caused his death. Subject took the victim's cell phone and continued to use it after his death. Subject gave a Mirandized[1] statement admitting to his actions. Subject was also present for additional robberies/assaults in the same area, near the same time.

This case originated in the district court as a juvenile action (No. 15-J-700955-007) because Miley was a minor at the time of the offense. On February 26, 2018, the juvenile court held the first of two hearings to determine whether Miley should be transferred to the circuit court as a juvenile offender to be tried as an adult. The first hearing addressed whether probable cause existed to support the charges of robbery and murder. Detective Cohn testified first. In the course of his

---

[1] *Miranda v. Arizona, infra.*

investigation of the victim's death, he had identified seven juvenile suspects. A cell phone had been stolen during the incident, and it was recovered in Miley's possession two days later. Miley was taken into custody, and he confessed to his involvement with the beating and robbery during an interview with Detective Cohn. Miley named the six other subjects with him and described that they had met at the liquor store and discussed robbing people. They saw the victim standing at the corner, and all seven juveniles assaulted him. Miley admitted that he struck the victim with his fist on his head and arm and that he took the cell phone. During the interview, Miley admitted the cell phone he had in his possession belonged to the victim. Detective Cohn interviewed two other juveniles who had been involved in the incident, and one corroborated Miley's account. Miley was arrested around 10:00 p.m. on July 26, and he was taken to headquarters to be interviewed. Miley did not request an attorney or to contact his parents. Miley did not appear to be confused as to why he was arrested, and although he initially denied being involved in the incident, he eventually confessed. Detective Cohn was not aware of Miley's mental health history, and he did not know if Miley had taken any medication or drugs, or had consumed any alcohol that night.

Miley did not call any witnesses, and the parties then argued their respective positions. Miley argued that while the competency evaluation in the juvenile file showed that he was competent, the report indicated that Miley had

serious cognitive limitations and mental health issues. This would go to whether he was easily influenced or threatened in order to say what the detective wanted to hear. There was no forensic evidence, video recordings, or neutral witnesses to establish any proof of Miley's involvement. Only statements made by Miley and an adult with the same charge provided support for the charges. The Commonwealth argued that probable cause existed to believe that Miley caused the victim's death based on the cell phone in his possession. There was no reason for the detective not to believe what Miley told him about his participation in the assault on and robbery of the victim. The juvenile court ruled that the information provided, including the cell phone ping, established probable cause for robbery and murder.

On March 26, 2018, the juvenile court held the second of the two transfer hearings to hear evidence concerning the eight statutory factors pursuant to KRS 640.010(2)(b).[2] By that time, Miley had turned 18 years old. Amanda Leo testified for the Commonwealth. She is a juvenile probation officer for the Department of Juvenile Justice (DJJ), and she began working with Miley in January 2018. She testified about Miley's prior juvenile record. He had been committed to the DJJ on a charge of second-degree robbery in May 2017, and he was placed at a youth development center about three hours away from Jefferson

---

[2] In the current version of the statute, these factors are found in subsection (c).

County in June 2017. Miley went absent without leave (AWOL) with a peer on July 20, 2017, after stealing a nurse's car. They returned to Louisville in the car, after which Miley assaulted the person with whom he escaped.

At the conclusion of the testimony, counsel for Miley introduced certified copies of his records obtained from the DJJ, Our Lady of Peace, and Uspiritus to establish Miley's cognitive deficits and mental health issues. Counsel then discussed the statutory factors in KRS 635.020 and argued that the issue was Miley's mental health history. He had been hospitalized three times for psychiatric issues and placed in a treatment facility rather than with a foster home when he came under the child protective services due to his mental health problems. Counsel went on to address Miley's early life with his mother, where he had experienced neglect and abuse. He had been diagnosed with attention deficit disorder (ADD) and behavioral disorders. His cognitive skills were borderline based on the evaluation. Based on this, counsel asked the court to deny transfer. The resources available to the juvenile court were sufficient to rehabilitate and punish Miley. There had been very little determination of what the level of culpability between the juveniles was or that Miley's conduct caused the victim's death, noting Miley's short height and light weight, and the lack of weapons used in the assault.

The Commonwealth argued that seven of the eight factors supported transfer. It noted the juvenile court had already found probable cause to support the charges (against a person, the most serious offense); Miley had reached the age of 18, meaning the DJJ's resources had been exhausted and there was no reasonable likelihood of rehabilitation if he remained in juvenile court; his prior record included second-degree robbery when he beat the victim; his acts indicated that he would engage in these acts in the community; and it was in the best interest that he be tried as an adult so that the public would be aware of what he had done. There was no evidence of gang activity, although a large group had engaged in this behavior that led to the victim's death.

In orally ruling on whether transfer would be appropriate, the juvenile court considered the maturity of the child factor, which included not only the child's age but environmental factors. The court recognized that Miley suffered from mental health issues and lower cognitive abilities. The court also considered records of Miley's schooling. The May 22, 2017, predisposition report included an interview with Miley's father, in which he reported that Miley refused to follow rules and jumped out of a second-floor window because he did not want to do his chores. He went to stay with his aunt for a "new start" but on the first day with her, he stole money from his grandfather as well as his aunt's car and drove back to Louisville. His father reported that he often did not know where Miley was, and he

was concerned that he would eventually be killed or kill someone. His father believed Miley needed an intervention to save him from the streets. This was two months prior to the incident leading to the victim's death. The court did not find enough to offset the factors favoring transfer, and it therefore transferred the case to circuit court to be heard by the grand jury.

After the hearing, the juvenile court entered an order memorializing its oral ruling on the eight factors, finding that six of the eight factors favored transfer. Regarding Miley's maturity, the court noted that he had reached the age of 18 but struggled with a low IQ, and it deemed that factor to be a "wash." And there was no evidence of gang participation. Based upon these findings as well as a finding of probable cause that Miley committed the offenses, the juvenile court transferred Miley to the circuit court in an order entered March 26, 2018.

In May 2018, the Jefferson County grand jury indicted Miley on charges of murder (complicity) pursuant to KRS 507.020 and KRS 502.020, and first-degree robbery (complicity) pursuant to KRS 515.020 and KRS 502.020. At his arraignment, Miley entered a plea of not guilty.

In July 2019, Miley, through his retained counsel, moved the court to suppress his statements, admissions, and confessions made during his interrogation by police, and he requested a hearing. He argued that he suffered from "serious mental cognitive functioning disabilities that made him more susceptible to the

overly coercive interrogation techniques utilized by police[.]" This, he asserted, violated his constitutional rights and made his statements involuntary. In addition, Miley argued that his statements were obtained in violation of his rights protected by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The court held a suppression hearing on July 19, 2019. Detective Cohn testified first. He is a detective assigned to the Homicide Department of the LMPD, and he was the lead detective for this case. Regarding his investigation, Detective Cohn explained that officers determined where the victim's cell phone was and set up surveillance. Miley and two other individuals were seen getting into a vehicle and driving away from that location. Officers then performed a traffic stop and found Miley sitting in the vehicle with the cell phone on his lap. Detective Cohn went to the area to determine whether the cell phone belonged to the victim. All three occupants of the vehicle were taken to headquarters, where they were interviewed. Miley said that the cell phone belonged to him prior to the start of the interview. Miley told him that his name was Tavion Murphy and that he had a different birthday. He signed, as Tavion Murphy, a waiver of his *Miranda* rights, which was introduced as an exhibit. Detective Cohn read the waiver to Miley, and he signed it before the interview began. A recording of clips from the interview was also introduced. The video of the interview established

that Miley was read both his *Miranda* rights and the portion detailing the waiver of his rights.

After signing the waiver, Miley unlocked the cell phone at Detective Cohn's request and told him what happened the night of incident. During his response, Detective Cohn testified that Miley appeared to be sober, calm, and communicative. He did note Miley's "calculated deception" as to his identity and who was in the vehicle. This showed Miley was smart enough be able to "configure" things how he wanted. Detective Cohn thought Miley understood the questions he was asking and the gravity of the situation. Examples of Miley's deception included giving a fictitious last name (which he signed on the *Miranda* waiver), a false date of birth, and a false residence; and stating that he did not know his social security number, that he did not know his cell phone number (because he had recently gotten it), and that his father was in the vehicle with him. He denied having escaped from a boot camp, despite a warrant being out due to his escape from one. Miley was street smart enough to think he could deceive the detective so that he could get out of the situation. Miley was arrested on a commissioner's warrant for his escape. Miley's description of the victim and the area was consistent with what Detective Cohn knew from the investigation. He did not ask any questions to Miley that he did not appear to understand. He received

logical answers from Miley. Detective Cohn did not have any concerns about Miley's cognitive or mental functioning.

Detective Cohn reviewed Miley's *Miranda* waiver files in several juvenile cases, and the four forms included information about his right to remain silent that were checked. The forms were dated from January 2016, January 2017, March 2017, and May 2017. These were all prior to the date that he interviewed Miley for the present case. During the interview, Miley did not act like a novice to the criminal justice system. He denied that any other agent of the Commonwealth or law enforcement had made any threats, engaged in any coercive activity, or intimidation as to Miley with regard to his statement.

On cross-examination, Detective Cohn admitted that approximately two hours elapsed between the time of the arrest and the time Miley signed the *Miranda* waiver. Miley communicated effectively and understood what was going on. Detective Cohn stated that he had not been trained to interrogate juveniles in a different manner from adults but that he was certified as a child forensic interviewer. He did not have a standardized approach for interviewing a juvenile as opposed to an adult. He had not reviewed Miley's competency and responsibility reports filed in the juvenile action. He did not have any information about Miley's IQ or educational background.

On redirect examination, Detective Cohn confirmed that during the time Miley sat in the interrogation room prior to his interview, he was not deliberately denied food or water, or the ability to sleep. The room temperature was not uncomfortable, and Miley had a chair. He had no cause for concern about Miley's cognitive functioning; the detective testified that, in his opinion, Miley understood what was going on.

During Detective Cohn's testimony, the court, with the agreement of the parties, opted to consider the case under the assumption that Miley was in custody at the time of the interrogation. The court raised a question about whether a parent should have been called based upon a recent newspaper article about a Marshall County school shooting. Detective Cohn responded that at the time he went over the waiver with Miley, Miley had given him a last name of Murphy and told him that one of the two other people in the vehicle with him had been his father.

Miley testified in his defense. He was 19 years old at the time of the hearing and had been 17 years old on the day he was arrested. Miley testified about the vehicle stop, stating that more than two officers were present. He said he was handcuffed when he was taken from the vehicle. He did not recall talking with Detective Cohn at the scene. Detective Cohn did not ask him if he would agree to go to the station; rather, he said the detective said, "we know who you

-11-

are" and knew that he had run away from the boot camp. He did not agree to go to the station that night. He admitted he gave the officer a false name that night. He used that name because it was his father's last name.

Miley testified that the other individuals in the car with him the night he was arrested were Anthony Mucker and Mucker's father, whose first name is also Anthony. He did not remember telling any of the officers that his own father was in the vehicle with him. He had been drinking alcohol the whole day and had also been smoking marijuana. He stopped drinking and smoking when he got into the vehicle with the Muckers; he did not recall how much time passed before they were stopped. He did not tell any officers that he had been drinking and smoking, and no one asked him if he had.

Miley said he asked for food the evening of his interview; the detective said he would look for something but never brought him food. None of the officers offered to contact his parents or to allow him to contact his parents at any time. After he signed the waiver, the detective did not offer to call his parents or allow him to do so. No other officer had discussed his constitutional rights with him. Miley eventually gave the detective his real name and date of birth. He did not provide his father's address because he did not know where he was living.

Regarding his education, Miley stated that he was in special education classes in middle school to help with his reading and that he had failed 3rd and 9th

grades.  The last grade of school he attended was 9th grade.  He never attended any other school, and he never obtained a General Educational Development diploma (GED).  Miley went on to testify that he had been in foster care for three years before coming to Louisville in 2008 to live with his father.  He had been physically and sexually abused while living with his mother; his mother and her boyfriend physically abused him, and the boyfriend sexually abused him.  He had been removed by child protective services.  Miley had seen a psychiatrist for several years until he was 14 or 15 years old, and he was prescribed medication.  He had been diagnosed with attention deficit hyperactivity disorder (ADHD) and something else he could not remember.  He had been hospitalized at Our Lady of Peace at the age of 15; he did not remember what this was for.  He began smoking marijuana and drinking alcohol when he was 15 years old.  At the time he was arrested, Miley stated he had been homeless since he ran away from boot camp.  He had been at the camp for a couple of months due to a prior juvenile case.  Prior to that, he had been living with his father.

On cross-examination, the Commonwealth addressed Miley's credibility, including statements Miley made about his date of birth, the identity of his father and where his father lived, his escape from boot camp, and how he got the phone.  Miley had been able to describe what happened that night, both before and after the incident with the victim.  Based upon his guilty pleas in the earlier

juvenile actions, he was aware of his right to remain silent. He admitted that he was able to read and write.

In a bench conference, Miley's counsel explained that Miley had deficits in his intelligence that affected his ability to understand and intelligently and voluntarily waive his constitutional rights. Miley's competency report from the juvenile action was later filed under seal.

After the hearing, the Commonwealth filed a response to the motion to suppress. It argued that Detective Cohn had read Miley the *Miranda* warning before he began questioning him, that Miley's statements were voluntary and not the product of coercion, and that Miley appeared rational and understood the situation. It also argued that parental and court-designated worker notification under KRS 610.200 and/or KRS 610.220 was a factor to consider when determining the voluntariness of the statement. The Commonwealth went on to attack Miley's credibility, noting that he provided false information to the officer, including his name.

In an order entered September 17, 2019, the circuit court denied Miley's motion to suppress. It made the following findings:

> 1. This does appear to have been a custodial interrogation.

> 2. Mr. Miley was informed of his *Miranda* rights in suitable detail. Furthermore, there is reason to believe,

based on Defendant's prior interactions with law enforcement, that he was already familiar with his rights.

3. The conduct of the interrogating officer was not coercive as that term has been developed in Kentucky and federal due process jurisprudence.

4. Based on the totality of the circumstances, Defendant did not appear to be impaired – either by reason of lack of cognitive abilities (he was able to formulate a planned deception regarding his identity) or secondary to substance abuse (based on his demeanor and speech while being interrogated – which seemed comparable to his demeanor while being examined by attorney at the hearing).

5. Based on the totality of the circumstances, Defendant's youth, in and of itself, does not support suppression of his statement. He was a worldly 17-year-old at the time.

6. Kentucky common law appears to support the Commonwealth's position on this motion. *Taylor v. Comm.*, 276 S.W.3d 800 (Ky. 2008).

The matter proceeded to a jury trial in October 2019. The jury was instructed that it could find Miley guilty of murder (complicity), first-degree manslaughter (complicity), second-degree manslaughter (complicity), or reckless homicide (complicity), and/or first-degree robbery (complicity). The jury returned guilty verdicts under the instructions for first-degree manslaughter and first-degree robbery. Following the penalty phase, the jury recommended 18-year sentences for both convictions, to be served concurrently. The circuit court entered a

-15-

judgment of conviction and sentence in accordance with the jury's recommendation on February 19, 2020. This belated appeal now follows.

On appeal, Miley seeks review of the orders denying his motion to suppress and transferring him to the circuit court as a youthful offender. The Commonwealth disputes that Miley is entitled to relief on either argument.

We shall first address whether the circuit court erred in denying the motion to suppress his confession based upon an alleged violation of his *Miranda* rights.

> When reviewing a ruling on a suppression motion, an appellate court generally employs a two-step process. First, findings of fact are reviewed and will not be set aside unless they are clearly erroneous. CR[3] 52.01; *Simpson v. Commonwealth*, 474 S.W.3d 544, 547 (Ky. 2015). Findings of fact are not clearly erroneous if they are supported by substantial evidence. *Commonwealth v. Deloney*, 20 S.W.3d 471, 473 (Ky. 2000). Substantial evidence is "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998) (citations omitted). Also, due regard is given to the opportunity of the circuit court to judge the credibility of the testifying officer and to assess the reasonableness of the officer's inferences. *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002). Second, the circuit court's application of the law to conclusive facts is reviewed de novo. *Simpson*, 474 S.W.3d at 547.

---

[3] Kentucky Rule of Civil Procedure.

*Commonwealth v. Perry*, 630 S.W.3d 671, 674 (Ky. 2021) (footnote omitted). "On review, the appellate court should not reevaluate the evidence or substitute its judgment of the credibility of the witnesses for that of the jury." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) (citing *Commonwealth v. Jones*, 880 S.W.2d 544 (Ky. 1994)). "In conducting our review, our proper role is to review findings of fact only for clear error while giving due deference to the inferences drawn from those facts by the trial judge." *Perkins v. Commonwealth*, 237 S.W.3d 215, 218 (Ky. App. 2007) (citing *Whitmore*, 92 S.W.3d at 79).

In *Miranda v. Arizona*, 384 U.S. at 478-79, 86 S. Ct. at 1630, the United States Supreme Court set forth the procedural safeguards that must be used to protect individuals in custody:

> [W]e hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and

-17-

> intelligently waive these rights and agree to answer
> questions or make a statement. But unless and until such
> warnings and waiver are demonstrated by the prosecution
> at trial, no evidence obtained as a result of interrogation
> can be used against him.

(Footnote omitted.) As recognized above, in order for *Miranda* rights to attach, the individual must be in custody. *See Wilson v. Commonwealth*, 199 S.W.3d 175, 180 (Ky. 2006) ("To determine whether a suspect is in custody for the purposes of *Miranda*, a court must consider the totality of the circumstances. But 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'").

Here, the parties and the court agreed that the court should assume that Miley was in custody for purposes of its analysis. Therefore, we need not address Miley's argument that he was in custody under the first prong of the *Miranda* analysis. We shall next review the voluntariness of Miley's waiver of his *Miranda* rights.

In *Mills v. Commonwealth*, 996 S.W.2d 473 (Ky. 1999), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010), the Supreme Court of Kentucky addressed both the voluntary waiver of a defendant's *Miranda* rights and the voluntariness of his confession.

> The question of whether a defendant has
> voluntarily waived his *Miranda* rights is analyzed
> somewhat differently than the question of whether the
> underlying confession is voluntary. As stated in

-18-

*Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987), which was decided a year after [*Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L .Ed. 2d 473 (1986)]:

> A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda v. Arizona*, *supra*, at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d 694. . . . The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986):
>
> > "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Ibid.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

Additionally, the Commonwealth only needs to prove waiver of *Miranda* rights by a preponderance of the evidence. *Connelly*, 479 U.S. at 168, 107 S. Ct. at 522, 93 L. Ed. 2d 473.

*Mills*, 996 S.W.2d at 481-82.

Miley contends that the *Miranda* warning he was given by Detective Cohn was not constitutionally sufficient based upon his age at the time of the interrogation, the location of the interrogation, misleading statements by Detective Cohn, and the absence of either a parent or a supporting adult. The totality of the circumstances, Miley argues, made the confession involuntary.

First, Miley argues that his waiver of his *Miranda* rights was coerced. He cites this Court to *Matthews v. Commonwealth*, 168 S.W.3d 14 (Ky. 2005), in support of his argument:

The inquiry of whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986): First, the relinquishment of the right by the defendant must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Id*. at 421, 106 S. Ct. at 1141. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived by the defendant. *Id*. (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

*Id*. at 21-22.

However, as the Commonwealth argues, Miley fails to point out any ways in which the police in this case were coercive.  This Court has addressed factors to be considered when deciding the issue of voluntariness:

> In examining voluntariness, "both the characteristics of the accused and the details of the interrogation are considered."  [*Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973)].  With respect to the characteristics of the accused, "reviewing courts consider such factors as age, education, intelligence, and linguistic ability." [*Bailey v. Commonwealth*, 194 S.W.3d 296, 300 (Ky. 2006)].  "Factors relevant to a characterization of the interrogation include the length of detention, the lack of any advice to the accused concerning his constitutional rights, the repeated or prolonged nature of the questioning, and the use of overtly coercive techniques such as the deprivation of food or sleep, or the use of humiliating tactics."  *Id*.  Of course, "[u]se of a totality of the circumstances analysis embodies this belief that voluntariness cannot '[turn] on the presence or absence of a single controlling criterion' but rather a 'careful scrutiny of all the surrounding circumstances.'"  *Id*. at 302.

*Commonwealth v. Bell*, 365 S.W.3d 216, 224 (Ky. App. 2012).  Miley did not address any of these factors, other than to argue that "[s]tudies show that adolescents respond differently to *Miranda* warnings than their adult counterparts[.]"  Our review of Detective Cohn's interview of Miley establishes that he was not coercive, nor were any of the factors present.  Therefore, the circuit

-21-

court did not err in concluding that Miley was not coerced into waiving his *Miranda* rights.

Second, Miley argues that he was not fully informed of his *Miranda* rights as the form he completed was not clear that anything he said could be used against him in a criminal proceeding, again citing his youth. The Commonwealth argues that this issue is unpreserved, as it was not argued at the circuit court level. Rather, Miley had argued below that his mental cognitive functioning disabilities made him more susceptible to overly coercive interrogation techniques, which was not raised in this appeal. Regardless of whether the issue was adequately preserved, we find no infirmity in the method by which Detective Cohn informed Miley of his *Miranda* rights. He slowly and deliberately went through the *Miranda* rights form, which included a waiver of rights section, by reading it to Miley prior to asking him to sign it. And we agree that the recording of the interview supports Detective Cohn's testimony that Miley appeared to be sober, calm, and communicative. We hold that Miley was adequately informed of his rights.

And third, Miley argues that even if we were to hold that his *Miranda* waiver was voluntary, his confession was involuntary, and therefore inadmissible, because it was the product of coercive police tactics, citing *N.C. v. Commonwealth*, 396 S.W.3d 852, 856 (Ky. 2013) ("the giving of *Miranda* warnings does not create

a fail-safe for the admissibility of the statement obtained.  Even then, admissibility

of the statement may be challenged on the ground that the statement was not

voluntarily given.").  As to the voluntariness of a confession, the *Mills* Court

explained:

> In *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), the United States Supreme Court stated that, absent a substantial factual dispute in the evidence, voluntariness of a confession may be properly decided by a reviewing court.  *Id.* at 391-92, 84 S. Ct. at 1789.  The voluntariness of a confession is assessed based on the totality of circumstances surrounding the making of the confession.  *Allee v. Commonwealth*, Ky., 454 S.W.2d 336, 341 (1970), *cert. granted*, 400 U.S. 990, 91 S. Ct. 454, 27 L. Ed. 2d 438 (1971), *case dismissed*, 401 U.S. 950, 91 S. Ct. 1186, 28 L. Ed. 2d 234 (1971).

*Mills*, 996 S.W.2d at 481.  The *Mills* Court then stated:

> Under the Due Process Clause of the Fourteenth Amendment, the question of the voluntariness of a confession turns on the presence or absence of coercive police activity.  *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 522, 93 L. Ed. 2d 473 (1986).  Likewise, state action is required before a confession may be found not voluntary under Section 11 of the Kentucky Constitution.  *Commonwealth v. Cooper*, Ky., 899 S.W.2d 75, 76 (1995).  Thus, while low intelligence and limited education are elements to be considered in the totality of the circumstances analysis, *Allee*, 454 S.W.2d at 341, these factors are only relevant inasmuch as their presence causes a defendant to be predisposed to yield to coercive police tactics.

*Id.*

In *Schneckloth*, *supra*, the United States Supreme Court set forth factors to consider when a court is determining whether a confession is "the product of an essentially free and unconstrained choice by its maker" and may be used against him or "if his will has been overborne and his capacity for self-determination critically impaired," where the use of a confession would offend due process. 412 U.S. at 225-26, 93 S. Ct. at 2047. "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Id*. at 226, 93 S. Ct. at 2047. Such factors include "the youth of the accused," "his lack of education," "his low intelligence," "the lack of any advice to the accused of his constitutional rights," "the length of detention," "the repeated and prolonged nature of the questioning," and finally "the use of physical punishment such as the deprivation of food or sleep[.]" *Id*. (citations omitted).

As we held above, Miley has not established that any of these coercive factors were present that would invalidate his confession.

In conjunction with this argument, Miley raises the question of whether the police officers were required to notify his parents and whether the failure to do so mandated suppression of his confession. KRS 610.200(1) provides:

> When a peace officer has taken or received a child into custody on a charge of committing an offense, the officer shall immediately inform the child of his constitutional rights and afford him the protections required thereunder, notify the parent, or if the child is committed, the Department of Juvenile Justice or the cabinet, as appropriate, and if the parent is not available, then a relative, guardian, or person exercising custodial control or supervision of the child, that the child has been taken into custody, give an account of specific charges against the child, including the specific statute alleged to have been violated, and the reasons for taking the child into custody.

The Commonwealth argues that a violation of this statute does not require suppression, citing *Taylor v. Commonwealth*, 276 S.W.3d 800, 806 (Ky. 2008):

> [T]his Court has held that a technical violation of KRS 610.200(1) does not automatically render a minor's confession inadmissible where it is otherwise shown to have been given voluntarily. *Murphy v. Commonwealth*, 50 S.W.3d 173, 184-185 (Ky. 2001). Although such an infringement is an important factor in the overall analysis, if the confession was otherwise made voluntarily and was not the result of police coercion, it can still be admissible even though the police did not adhere to the statutory provisions of the juvenile code. *Id*. at 187 (Keller, J., concurring).

We agree that, because Miley's confession was voluntary and he was informed of his *Miranda* rights, the failure to notify his parents does not require suppression in this case.

Accordingly, we find no abuse of discretion in the circuit court's decision to deny Miley's motion to suppress his confession.

For his second argument, Miley contends that the juvenile court erred in transferring his case to the circuit court for prosecution as a youthful offender. In *Stout v. Commonwealth*, 44 S.W.3d 781 (Ky. App. 2000), this Court discussed the application of the Unified Juvenile Code, KRS Chapters 600 to 645, as well as the applicable standard of review:

> It is axiomatic that a juvenile offender has no constitutional right to be tried in juvenile court. In our Unified Juvenile Code, our Legislature has created a scheme in which most juvenile offenders are proceeded against in the juvenile division of district court. However, our Legislature has recognized that not all juvenile offenders should be proceeded against in juvenile court and, accordingly, the scheme it enacted provides for both automatic and discretionary transfer of certain juvenile offenders to circuit court. In the case *sub judice*, since Stout was charged with two Class D felonies, was at least 16 years old, and because he had previously "been adjudicated a public offender for a felony offense," it was within the discretion of the district court to transfer him to circuit court.

*Id*. at 785-86 (footnotes omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In KRS 635.020, the General Assembly set forth the criteria a court must consider to decide how a child will be tried. The subsection applicable in this case states:

> (2) If a child charged with a capital offense, Class A felony, or Class B felony, had attained age fourteen (14)

at the time of the alleged commission of the offense, the court shall, upon motion of the county attorney made prior to adjudication, and after the county attorney has consulted with the Commonwealth's attorney, that the child be proceeded against as a youthful offender, proceed in accordance with the provisions of KRS 640.010.

The version of KRS 640.010(2) in effect from July 14, 2000, to June 28, 2021, provided:

In the case of a child alleged to be a youthful offender by falling within the purview of KRS 635.020(2), (3), (5), (6), (7), or (8), the District Court shall, upon motion by the county attorney to proceed under this chapter, and after the county attorney has consulted with the Commonwealth's attorney, conduct a preliminary hearing to determine if the child should be transferred to Circuit Court as a youthful offender. The preliminary hearing shall be conducted in accordance with the Rules of Criminal Procedure.

(a) At the preliminary hearing, the court shall determine if there is probable cause to believe that an offense was committed, that the child committed the offense, and that the child is of sufficient age and has the requisite number of prior adjudications, if any, necessary to fall within the purview of KRS 635.020.

(b) If the District Court determines probable cause exists, the court shall consider the following factors before determining whether the child's case shall be transferred to the Circuit Court:

1. The seriousness of the alleged offense;

2. Whether the offense was against persons or property, with greater weight being given to offenses against persons;

3. The maturity of the child as determined by his environment;

4. The child's prior record;

5. The best interest of the child and community;

6. The prospects of adequate protection of the public;

7. The likelihood of reasonable rehabilitation of the child by the use of procedures, services, and facilities currently available to the juvenile justice system; and

8. Evidence of a child's participation in a gang.

The current version includes two additional factors for the court to consider, namely, whether the child has a serious intellectual disability pursuant to KRS 532.130 and whether the child used a firearm during the commission of the offense.

In the present case, Miley argues that the juvenile court essentially focused on one factor, the seriousness of the crime, and denied him a full

investigation into the reasons for the transfer as required in KRS 640.010(2). We

disagree.

This Court in *Harden v. Commonwealth*, 885 S.W.2d 323, 325 (Ky.

App. 1994), addressed the court's need to meaningfully consider all of the factors

before granting transfer:

> In *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), the Supreme Court held that a court reviewing the transfer of a juvenile to be tried as an adult must give the matter a meaningful review and not assume there were adequate reasons therefor or that a full investigation was made. The High Court required, as does KRS 640.010(2), that the lower court state its reasons or considerations for the transfer. While the Court held that the statement need not be formal or include conventional findings of fact, the Court stated:
>
> > But the statement should be sufficient to demonstrate that the statutory requirement of "full investigation" has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review.
>
> *Id*. at 561, 86 S. Ct. at 1057.
>
> Similarly, the Kentucky Courts have held that, in setting out the reasons for the transfer, the lower court must be specific enough to permit a meaningful review for the purpose of determining whether there has been compliance with the statute. *Bingham v. Commonwealth*, Ky., 550 S.W.2d 535 (1977); *Schooley v. Commonwealth*, Ky. App., 556 S.W.2d 912 (1977); and *Hubbs v. Commonwealth*, Ky.[,] 511 S.W.2d 664 (1974).

-29-

*Harden*, 885 S.W.2d at 325 (footnote omitted).

As the Commonwealth argues, the juvenile court found that six of the eight factors weighed in favor of transfer. There was no evidence that Miley had participated in a gang, and the second factor as to his maturity was a "wash" as he had reached the age of 18 but struggled with a low IQ. There was substantial evidence presented at the bifurcated hearings to support the juvenile court's decision that the remaining six factors supported transfer, including Detective Cohn's testimony concerning the seriousness of the crime and that it was against a person as well as the interview with Miley's father detailed in a May 2017 predisposition report in which he expressed his concern that Miley would eventually be killed or kill someone based on his behavior. This testimony and the records submitted at the hearing permitted the juvenile court to properly weigh the factors set forth in KRS 640.010(2). We find no abuse of discretion in the juvenile court's decision to transfer Miley to the circuit court to be tried as a youthful offender.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Londa J. Adkins
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General
Frankfort, Kentucky